Selwyn A. ROBINSON, et al.,
Plaintiffs-Appellees,

v.

George R. ARIYOSHI, Governor, et al.,
Defendants-Appellants,

and

McBryde Sugar Company, Limited, et al., Defendants.

No. 78–2264.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 12, 1984.

Decided Feb. 20, 1985.

Rehearing Denied May 10, 1985.

Alexander C. Marrack, Hoddick, Reinwald, O'Connor & Marrack, for plaintiffs-appellees.

J. Russell Cades, Robert B. Bunn, Cades Schutte Fleming & Wright, Honolulu, Hawaii, Telford Taylor, Taylor, Ferencz & Simon, Herbert Wechsler, New York City, William F. Quinn, Honolulu, Hawaii, Clinton Shiraishi, Shiraishi & Yamada, Lihue, Hawaii, for McBryde Sugar Co. Ltd., et al.

Williamson B.C. Chang, Sp. Deputy Atty. Gen., Honolulu, Hawaii, amicus curiae.

Ronald Albu, Honolulu, Hawaii, for Waihe'e Farmers Residents Ass'n.

Clinton R. Ashford, Mitsuo Uyehara, Honolulu, Hawaii, for Hawaiian Sugar Planters' Ass'n.

Andrew S.O. Lee, Deputy Atty. Gen., Honolulu, Hawaii, for defendants-appellants.

Before GOODWIN and TANG, Circuit Judges, and GRANT *, District Judge.

GOODWIN, Circuit Judge.

The district court, in an action brought under 42 U.S.C. § 1983 challenging an alleged threat to divest plaintiffs' irrigation water rights, enjoined the named state officials from taking any action to enforce a recent decree of the state courts that appeared to be adverse to the property rights of the plaintiffs. The state officials appeal, raising a number of procedural and substantive issues. We will first set out the factual context in which this dispute has kept territorial, state, and federal courts intermittently busy for more than sixty years.

*Background*

In 1889 the predecessors in title of the plaintiffs, Gay and Robinson, owned substantial land grants within the ahupuaa of Hanapepe, a local designation of land extending from the top of the central mountain mass of the Island of Kauai to the sea and roughly encompassing the drainage of the Hanapepe River. At the mauka, or upper part of the ahupuaa, the annual rainfall ranges from four to five hundred inches. At lower elevations rainfall averages as little as twenty-three inches and in many parts of the ahupuaa most types of agriculture are not possible without irrigation.

In the early days of the development of sugar cane fields on Kauai, the owners and lessees of the privately-owned lands built dams, flumes and ditches in order to distribute the abundant rainfall from the wettest portions of their lands to fertile but dry neighboring land areas. As the years went by and more lands were brought into production, the irrigation works became fairly elaborate. By 1922 Gay and Robinson had been to court at least once and had their title confirmed by the territorial courts to a substantial portion of the lands. The lands known as the Ili of Koula were drained by the Koula branch of the Hanapepe River, and from this drainage substantial volumes of irrigation water were diverted into a dry area that was outside the Hanapepe ahupuaa. Similar diversions of water to dry land were being made contemporaneously by Gay and Robinson from their nearby lands in the Ili of Manuahi, the other principal branch feeding the Hanapepe River. This state of affairs had evolved gradually over the years, beginning before 1891, and has been in effect more or less continually until the present time.

---

* The Honorable Robert A. Grant, United States District Judge, Northern District of Indiana sitting by designation.

In the 1920's the territorial government's increasing interest in water for the development of dry lands at lower elevations, some of which were owned or controlled by the Territory of Hawaii, produced litigation which in 1931 resulted in a decree of the Territorial Court. The Territorial Court held that Gay and Robinson were the owners of "normal surplus" water flowing from their Ilis of Koula and Manuahi into the Hanapepe River, and confirmed their right to divert that water for use outside the Hanapepe drainage. *Territory v. Gay,* 31 Hawaii 376, 387–88 (1930), *aff'd,* 52 F.2d 356 (9th Cir.), *cert. denied,* 284 U.S. 677, 52 S.Ct. 131, 76 L.Ed. 572 (1931) (*Territory I*).

In 1941 the Olokele Sugar Company succeeded to certain lands that were being supplied with irrigation water from the Gay and Robinson engineering efforts, and in 1949 the Gay and Robinson successors opened a new tunnel to supply water to their own and Olokele lands known locally as the Makaweli district.

The Hawaiian Statehood Act, Pub.L. No. 86–3, 73 Stat. 4, *reprinted in* 1959 U.S. Code Cong. & Ad.News 5, *inter alia,* confirmed existing statutory law of the territory and approved the new state's constitution. Gay and Robinson claim that the state constitution includes protection of their court-decreed and vested right to divert and use water from their mauka lands drained by the Koula and Manuahi branches of the Hanapepe.[1] The state officials, however, argue as if the matter were open for a fresh decision, that the private use outside the ahupuaa of a large volume of Hanapepe water by Gay and Robinson and their associates is both undesirable and contrary to state law.

In 1959 the McBryde Sugar Company commenced in the new state court an action against a number of defendants, among whom Gay and Robinson were named. McBryde sued the state, Olokele, Gay and Robinson, and others referred to as the "small owners" to obtain a declaration of the rights of various parties along the Hanapepe upstream and downstream to various water rights, appurtenant, prescriptive, "ancient," or otherwise derived. The Hawaii state trial court in 1968 declared in a 65-page decision the rights of the parties including "other" small holders whose "ancient" and "appurtenant" rights were acknowledged by the principal parties in the controversy. *McBryde Sugar Co. v. Robinson,* S.P. No. 108 (5th Cir.Ct. of Hawaii, Dec. 10, 1968). Both the state and the larger owners appealed to the Supreme Court of Hawaii, challenging various portions of the trial court's decree. No party questioned existing Hawaii water law as announced in a number of earlier territorial cases.

The Supreme Court of Hawaii in 1973 *sua sponte* overruled all territorial cases to the contrary and adopted the English common law doctrine of riparian rights. *McBryde Sugar Co. v. Robinson, et al.,* 54 Hawaii 174, 504 P.2d 1330, 1344 (1973). In this decision, which we will refer to as *McBryde I,* the court also held *sua sponte* that there was no such legal category as "normal daily surplus water" and declared that the state, as sovereign, owned and had the exclusive right to control the flow of the Hanapepe River. *Id.* 504 P.2d at 1345. *McBryde I* further announced that because the flow of the Hanapepe was the sovereign property of the State of Hawaii, McBryde's claim of a prescriptive right to divert water could not be sustained against the state. *Id.*

The parties adversely affected by the holding in *McBryde I* petitioned for rehearing and the state supreme court allowed a rehearing on the limited issue of the proper construction of Hawaii Rev.Stat. § 7–1 (a century-old territorial statute dealing largely with drinking water and rights of way on roads over private lands) and the meaning of the word "appurtenant". The parties attempted to enlarge the scope of the

---

1. Hawaii Const. art. XVIII, § 9, *reprinted* in 1 Hawaii Rev.Stat. (1968, Supp.1983) provides:
   Except as otherwise provided by amendments to this constitution, all existing ... judgments, ... orders, decrees, ... titles and rights shall continue unaffected notwithstanding the taking effect of the amendments....

rehearing to include state and federal constitutional claims but their attempt was summarily rejected. *See Robinson v. Ariyoshi*, 441 F.Supp. 559, 564 (D.Hawaii 1977) (*Robinson I*). Rehearing was denied in *McBryde Sugar Co. v. Robinson*, 55 Hawaii 260, 517 P.2d 26 (1973) (*McBryde II*).[2] In due course the Supreme Court of the United States denied review, *McBryde Sugar Co. v. Hawaii*, 417 U.S. 962, 94 S.Ct. 3164, 41 L.Ed.2d 1135 (1974) (*McBryde III*), and in 1974 this litigation began in the United States District Court for the District of Hawaii. The decision in the district court permanently enjoined the named state officials from enforcing against these plaintiffs any "new law" announced in *McBryde I* and *II*. *Robinson I*, 441 F.Supp. at 586.

The leisurely pace of this litigation has produced three oral arguments in this court, two of which were followed by referral of certified questions to the Supreme Court of Hawaii. *See Robinson v. Ariyoshi*, 65 Hawaii 641, 658 P.2d 287 (1982) (*Robinson II*). Following the publication of the state court's answers to the certified questions, the parties briefed the remaining issues that had been narrowed by the earlier proceedings and reargued the case. A number of complex questions remain, but to expedite the matter we will discuss only those essential to a resolution of the main question: Can the state, by a judicial decision which creates a major change in property law, divest property interests?

### Jurisdiction

Before we can address that constitutional question (tendered by the § 1983 claims in this case), we must first dispose of preliminary questions concerning our jurisdiction. The state officials argue: (1) there is no case or controversy because no state officer has made any demand upon the plaintiffs to remove or to cease using their water diversion works; and (2) the plaintiffs' property rights are defined by state law and the state courts have defined those rights. The state officials argue that any federal question that may have remained following *McBryde II* in 1973 has been precluded by the doctrine of *res judicata* at all times after the United States Supreme Court denied both appellate review and certiorari in *McBryde III*.

### Case or Controversy

■ First, as to case or controversy, we hold that even though the named state officials have not as yet filed actions at law or commenced administrative proceedings against the plaintiffs, the litigation history of the past half century, together with the language of *McBryde I* and *II*, constitutes a sufficient cloud upon the title of the plaintiffs so as to interfere substantially with the financing of improvements or any potential sale of their lands. The dispute constitutes a case or controversy within the meaning of U.S.Const. art. III, § 2. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201 and 2283.

### Res judicata

■ With reference to a res judicata bar against these claims, the question becomes more complex. It is settled that "horizontal" appeals will not lie to the United States District Courts to overturn allegedly erroneous decisions on federal constitutional questions by the highest court of a state. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 416, 44 S.Ct. 149, 150, 68 L.Ed. 362 (1923). *See also District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 482, 103 S.Ct. 1303, 1314, 75 L.Ed.2d 206 (1983). However, *Rooker* made it clear that the only constitutional questions arising from a state proceeding on which the Supreme Court considered itself to be the final arbi-

2. The "opinion" in *McBryde II*, apart from formal recitals consists of the following:

    Arguments of the parties were heard at the hearing had on September 18, 1973. After careful consideration of the briefs and arguments presented at the hearing, we find no reason to change the decision filed herein.

The citation to *McBryde II* is noteworthy, however, for the scholarly dissent of Levinson, J., whose historical research provides valuable background and whose reasoning was substantially followed by the district court.

ter, were those that "actually arose in the cause" in which a full hearing was held and where the judgment was responsive to the issues. 263 U.S. at 415, 44 S.Ct. at 150. Otherwise, if *Rooker* were a blanket jurisdictional bar precluding the litigation of claims even if there had been no actual state court opportunity to litigate them, *Rooker* would swallow the "full and fair opportunity to litigate" limitation to res judicata clearly established elsewhere by the Supreme Court. *See e.g., Allen v. McCurry,* 449 U.S. 90, 95, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980).

Consistent with that analysis, we have read *Rooker* not as a jurisdictional barrier but as an application of res judicata. *See e.g., Williams v. Washington,* 554 F.2d 369, 371 (9th Cir.1977); *Hutcherson v. Lehtin,* 485 F.2d 567, 569 (9th Cir.1973); *Francisco Enterprises, Inc. v. Kirby,* 482 F.2d 481, 485 (9th Cir.1973), *cert. denied,* 415 U.S. 916, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974). The Supreme Court, in one of two majority opinions which cited *Rooker* did so in a discussion of res judicata. *Fishgold v. Sullivan Drydock & Repair Corp.,* 328 U.S. 275, 282–83, 66 S.Ct. 1105, 1109–10, 90 L.Ed. 1230 (1946). The other, more recent, Supreme Court majority citation of *Rooker* has been in a jurisdiction context, with acknowledgment of the res judicata implications. *Feldman,* 460 U.S. at 476, 103 S.Ct. at 1311. In *Feldman,* the Supreme Court held that where allegations underlying a state's highest court's final judicial decision are "inextricably intertwined" with issues presented to a federal court, the federal court has no jurisdiction over those issues, even if those challenges included constitutional claims. *Id.* at 486, 103 S.Ct. at 1316–17.

Faced with the task of deciding our power to review constitutional issues which arise from a state court proceeding, we view the res judicata requirement of full and fair opportunity to litigate, and the *Feldman* "inextricably intertwined" barrier to federal jurisdiction as two sides of the same coin. Under the rubric of either "jurisdiction" or "res judicata," the crux of the question is whether there has already been actual consideration of and a decision on the issue presented. If consideration and decision have been accomplished, action in federal court is an impermissible "appeal" from the state court decision. *See Reynolds v. Georgia,* 640 F.2d 702, 705–06 n. 2 (5th Cir.) *cert. denied,* 454 U.S. 865, 102 S.Ct. 326, 70 L.Ed.2d 165 (1981). If no consideration has been given, or any decision on the matter is ambiguous, it is unlikely that the issues presented to the state high court and to the federal court are so "inextricably intertwined" that the federal court cannot take jurisdiction. Nor is it likely that there will have been a full enough and fair enough opportunity for litigation to warrant the claim preclusive effect of res judicata.

■ Proceeding under the doctrinal umbrella of res judicata, we find that Robinson's due process claims were not and could not have been litigated in the *McBryde* state proceedings because the Hawaii Supreme Court refused to consider Robinson's federal claims. *Robinson I,* 441 F.Supp. at 564. In *Haring v. Prosise,* 462 U.S. 306, 103 S.Ct. 2368, 2373, 76 L.Ed.2d 595 (1983), the Supreme Court noted that in a § 1983 action, collateral estoppel effect will not be given to a state court conclusion where the complaining party did not have full and fair opportunity to litigate a claim in state court or where the state court demonstrated inability or unwillingness to protect federal rights. We do not hesitate to apply the same caveat in this res judicata context. The principle is fully consonant with the philosophy expressed in the Restatement of Judgments which provides for an exception to the general rule of preclusion where "[a] new determination of the issue is warranted by differences in quality or extensiveness of the procedures followed in the two courts or by factors relating to the allocation of jurisdiction between them." *Restatement (Second) of Judgments* § 28(3).

■ Turning to application of the *Feldman* doctrine, we cannot see how federal constitutional issues which the state court refused to consider on a petition for rehearing are at all, let alone inextricably, inter-

twined with a previously reached state court judgment on riparian rights. The Hawaii Supreme Court decision to deny rehearing of the substantive questions of state law may or may not have been intertwined with its decision also to deny hearing of federal constitutional claims. We are not asked to decide whether the composite denial of rehearing and refusal to hear was correct; the Supreme Court, has already declined to review the matter. *McBryde III*, 417 U.S. 962, 94 S.Ct. 3164, 41 L.Ed.2d 1135. We are asked to review district court findings about constitutional claims which themselves were never decided by a state court, intertwined or otherwise.[3]

Thus we are in no danger of serving impermissibly in an appellate role vis-a-vis the Hawaii state court, or of reopening matters which have been litigated and decided in state court. Where a state court has refused to entertain federal constitutional claims, a federal court violates the precepts of neither subject matter jurisdiction nor res judicata by hearing those claims.

### Merits

The state conceded at oral argument that the Fourteenth Amendment would require it to pay just compensation if it attempted to take vested property rights. The substantive question, therefore, is whether the state can declare, by court decision, that the water rights in this case have not vested. The short answer is no.

The district court's opinion in *Robinson I* makes clear that considerable property interests were at stake. 441 F.Supp. at 572–80. In summary form, the interests affected by *McBryde I* and *II* include:

(1) The water rights which as private property had been bought, sold and

leased freely, and which had been the subject of state and local taxation as well as condemnation for ditch rights-of-way;

(2) The expenditures by G & R and Olokele of almost one million dollars in building an extensive water transportation system for irrigation of their sugar lands, lands now potentially destined to become pasture; and

(3) The interests of McBryde Sugar Company, which stands, if its rights are vested, in the same position as Gay and Robinson.

On April 28, 1930, the Supreme Court of the Territory of Hawaii, in litigation between substantially the same parties that are here today, except for the McBryde Sugar Company, held that the common law doctrine of riparian rights was not in force in Hawaii with reference to surplus waters of the normal flow of a stream. The same court further held that the owner (konohiki) of the land (ili) could use the water collected on his ili as he saw fit, subject to the rights of downstream owners to drinking water and other domestic uses that the parties in all this litigation have agreed have not been in controversy. *Territory I*, 31 Hawaii at 387–88, 395. When that case reached this court, we affirmed in an opinion which stated that the definition of property rights and water rights in light of the feudal history of land tenure in the islands was best left to the local courts. *Territory of Hawaii v. Gay*, 52 F.2d 356, 359 (9th Cir.1931) (*Territory II*). The water law, at least between the territorial government and the Gay and Robinson interests, thereafter remained settled until statehood.

Relying upon the decrees in *Territory I and II*, Gay and Robinson proceeded with further development of their plantations.

**3.** If the procedural posture of the state court action had, for some reason, altogether prevented the plaintiffs from raising federal constitutional claims in their petition for rehearing, the federal district court would have had original jurisdiction over those claims. *Wood v. Orange County*, 715 F.2d 1543, 1546–47 (11th Cir.1983) *cert. denied,* —— U.S. ——, 104 S.Ct. 2398, 81 L.Ed.2d 355 (1984). We are loathe to grant less constitutional protection where plaintiffs have

responsibly exercised an opportunity to raise their claims and have been turned away from the state tribunal without so much as an explanation. Like the court in *Wood,* we are concerned that "[s]uch a result might deprive [plaintiffs] of any forum, state or federal, where [they have] a reasonable opportunity to present [their] federal constitutional claims, a result arguably contrary to the requirement of due process." *Id.* at 1547.

By the time this litigation reached the district court, in *Robinson I*, improvements costing many millions of dollars had been constructed on the affected lands. By any reasonable interpretation of the word "vested," Gay and Robinson's rights to the continued use of their water and related engineering works had become vested.

The *Robinson I* court found that McBryde Sugar Company also relied upon the law set forth in *Territory II*, and developed water rights that became vested. (Territorial cases are collected in *Territory I*, 31 Hawaii at 384.) The extent of McBryde's rights, however, the district court left for further litigation in the state courts. 441 F.Supp. at 586–87.

The parties concede that the State of Hawaii has the sovereign power to change its laws from time to time as its legislature may see fit, and may, by changing its laws, radically change the definitions of property rights and the manner in which property rights can be controlled or transferred.

The state may also change its laws by judicial decision as well as by legislative action. Insofar as judicial changes in the law operate prospectively to affect property rights vesting after the law is changed, no specific federal question is presented by the state's choice of implement in changing state law. *See Hughes v. Washington,* 389 U.S. 290, 295, 88 S.Ct. 438, 441, 19 L.Ed.2d 530 (1967) (Stewart, J. concurring).

■ We assume, therefore, for the purposes of this case, that the Supreme Court of Hawaii was acting well within its judicial power under the state constitution when it overruled earlier cases and declared for the first time, after more than a century of a different law, that the common law doctrine of riparian ownership was the law of Hawaii. This declaration of a change in the water law of Hawaii may be effective with respect to real property rights created in Hawaii after the *McBryde I* decision became final. New law, however, cannot divest rights that were vested before the court announced the new law. *See Hughes,* 389 U.S. at 295–98, 88 S.Ct. at 441–43.

■ There is no constitutional barrier to the state's exercise of its power of eminent domain to condemn and take vested property rights for public purposes. *See Hawaii Housing Authority v. Midkiff,* — U.S. ——, 104 S.Ct. 2321, 2330, 81 L.Ed.2d 186 (1984). ("Redistribution of fees simple [can be] a rational exercise of the eminent domain power.") The state has the power to take over the water works constructed by Gay and Robinson and their associates upon exercising the powers of eminent domain in a manner compatible with the Fourteenth Amendment. *See Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922).

■ In light of the above authorities, the plaintiffs in this case, having acquired through judicial process a *de jure* vested right to divert water from their lands within the Hanapepe watershed to their own or related lands outside the watershed, *Territory I*, 31 Hawaii at 386, cannot now be divested of this right without just compensation.

It has been clear since *Territory I* that the downstream rights of small owners to domestic water and "ancient" rights to water for taro cultivation on lands that were wet lands before the litigation commenced have never been contested by Gay and Robinson. These rights were specifically left open by the trial court in the first territorial litigation arising out of the earliest diversions of water. The rights of the small holders that were declared in *McBryde I* and *II* were not disturbed in the district court in the case at bar but were left to be sorted out by the state courts consistent with the recognition of any rights that vested before 1973.

As noted, the district court entered a decree granting injunctive relief against named state officials. Because the state officers in these proceedings have taken no steps to interfere with plaintiffs' property, and have denied that they are presently planning to take such steps, the injunction may have been premature. (The officers still argue, however, that the state is free under *McBryde I* and *II*, to take any action

it may see fit in the future to control the flow of the river.) A declaration of the rights of the parties would appear to be sufficient to assure the owners of the rights confirmed in *Territory II.* The state must bring condemnation proceedings before it can interfere with vested water rights and the enjoyment of the improvements made in reliance thereon.

The judgment of the district court is affirmed in all respects insofar as it declares the rights of the parties. The injunctions against the named defendants are vacated without prejudice to the continuing jurisdiction of the district court to enjoin future state officeholders from conduct, if any, in violation of the rights of the plaintiffs should such a case arise. The plaintiffs are entitled to costs and such attorneys fees as the district court may determine to be reasonable pursuant to 42 U.S.C. § 1988.

Affirmed in part, vacated in part, and remanded for the entry of a modified judgment.