**CORPORATION OF the PRESIDING BISHOP OF the CHURCH OF JESUS CHRIST OF the LATTER–DAY SAINTS, Appellant,**

**v.**

**Donald P. HODEL, Secretary of the Interior, et al.**

**No. 86–5451.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 10, 1987.

Decided Oct. 9, 1987.

---

Rex E. Lee, Washington, D.C., with whom Wilford W. Kirton, Jr., Merrill F. Nelson, Salt Lake City, Utah, and Marcus G. Faust, Washington, D.C., were on brief, for appellant.

Douglas W. Kmiec, Deputy Asst. Atty. Gen., Office of Legal Counsel, Dept. of Justice, with whom Richard K. Willard, Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty., and John F. Cordes, Atty., Dept. of Justice, were on brief for appellee, Secretary of Interior. Richard G. Taranto, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for the Secretary of Interior.

L. Su'esu'e Lutu, Atty. Gen., American Samoa, American Samoa of the Bar of the High Court of the American Samoa, pro hac vice by special leave of Court, with whom Arnold H. Leibowitz and Marcus W.

Sisk, Jr., Washington, D.C., were on brief, for appellee, American Samoa Government.

Before SILBERMAN, BUCKLEY and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

Appellant, Corporation of the Presiding Bishop of the Church of Jesus Christ of the Latter-Day Saints ("the Church"), purchased approximately 300 acres of land located in American Samoa in 1953. In 1979, appellant filed in the High Court of American Samoa a trespass action against the Puailoa family for intruding upon the Church's tract of land, known as Malaeimi. The High Court concluded that appellant did not have title to the land because the 1953 deed was invalid, and because the Church failed to satisfy the criteria necessary to obtain title by adverse possession.

After failing to obtain relief from the courts of American Samoa, appellant asked the Secretary of the Interior of the United States ("Secretary") to exercise his authority over the territory and review the decision of the High Court. The Secretary, while acknowledging his power to intervene, declined to set aside the decision of the High Court.

Appellant then filed in the United States District Court for the District of Columbia an action against the Secretary challenging the constitutionality of his refusal to overturn the decision of the High Court. The District Court dismissed appellant's complaint for failure to raise a claim upon which relief could be granted, 637 F.Supp. 1398. Appellant now appeals the order of the District Court, and contends that the Court erred by denying the Church the opportunity to prove that it was deprived of property without due process, by concluding that the denial of the Church's adverse possession claim was not based on a race restriction, and by refusing to allow the Church to prove that the High Court lacks the independence and finality of judgment necessary to afford due process and equal protection. We affirm the order of the District Court dismissing appellant's complaint. Before setting out the reasons for our affirmance, however, we pause to place this case in the context of American authority over Samoa, the territory's judicial system, and the traditional Samoan conception of land ownership.

Article IV, § 3, cl. 2 of the Constitution of the United States grants Congress plenary power over American territories: "The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." American Samoa, comprising seven islands in the South Pacific Ocean, became a United States territory in 1900. In 1929, when Congress ratified the treaties ceding the islands to the United States, it also provided that until it established a governmental structure for the territory "all civil, judicial, and military powers [in American Samoa] shall be vested in such person or persons and shall be exercised in such manner as the President of the United States shall direct."[1] The Department of the Navy administered American Samoa until 1951, when President Truman by Executive Order transferred authority over the territory to the Secretary of the Interior.[2] The Executive Order broadly authorizes the Secretary of the Interior to "take such action as may be necessary and appropriate, and in harmony with applicable law." The Secretary of the Interior, therefore, possesses plenary authority over the judicial system of American Samoa.

The Secretary appoints the Chief Justice of American Samoa and the Associate Justices of the High Court,[3] and may remove them for cause.[4] The budget for the territory, and all laws passed by the Samoan

---

**1.** 48 U.S.C. § 1661(c).

**2.** Exec. Order No. 10264, 16 Fed.Reg. 6419 (1951), *reprinted in* 48 U.S.C. § 1662.

**3.** Rev. Const. of Am.Samoa, Art. III, § 3.

**4.** Am.Samoa Code § 3.1001.

legislature, including those relating to the organization of the courts, must be submitted to the Secretary for approval.[5] The High Court also includes Associate Judges who are appointed by the territorial Governor and confirmed by the territorial Senate. These Associate Judges "are typically traditional Samoan leaders with knowledge of local customs."[6]

Communal ownership of land is the cornerstone of the traditional Samoan way of life—the "Fa'a Samoa." Samoan society is based upon the existence of extended families that may consist of hundreds of members.[7] These families communally own more than 90% of the land in American Samoa. A chief—or "matai"—presides over each extended family. The matai exercises control over his family's communally owned land, but he does not own it: a matai may not transfer communally owned land without the approval of his family and of the territorial Governor.[8]

## I

In 1906, Puailoa Vaiuli, matai of the Puailoa family, leased 360 acres of Malaeimi to the Church of Jesus Christ of the Latter-Day Saints for a term of forty years. In 1929, when Vaiuli died, Nouata and Pasene asked the High Court to decide which one of them should succeed Vaiuli as matai of the Puailoa family. Although the Church was not a party to the dispute over Vaiuli's successor, the outcome of that case would decide to whom the Church must pay rent for the remaining period of its forty year lease to Malaeimi. In 1931 the High Court named Nouata as matai of the Puailoa family, but it awarded the rents from Malaeimi to Vaiuli's widow, Salataima. In

an oral opinion, the Court stated that "that part of Malaeimi that is leased to the Mormon Missionaries is the property of the widow of Puailoa and that she should have during her lifetime the rents."[9] After the High Court handed down its decision awarding the rents to Salataima, the Puailoa family petitioned the territorial Governor for a new trial on the grounds that the issue of ownership of the leased land had not been properly before the Court. The Governor declined the request, and the Puailoa family did not appeal the decision to the Appellate Division of the High Court.[10] Salataima continued to receive the rents, in 1944 renewed the Church's lease on Malaeimi for another forty year term, and in 1953, sold to the Church approximately 300 acres of land that it had previously leased.

In 1978, Tavete M. Puailoa, Nouata's successor as matai of the Puailoa family, petitioned the High Court to reopen the 1931 case (*Nouata I*), and to set aside the award of ownership of Malaeimi to Salataima.[11] The Church, as successor in interest to Salataima, defended against the petition. The trial court in *Nouata II* denied the motion to reopen *Nouata I*, largely because the Puailoa family had waited too long to assert its rights. The Court stated that the family's 47-year delay in challenging *Nouata I* was "simply too long to countenance."[12] Reopening the case would "undermine the settled expectations of all those who own property in American Samoa," and "engender an instability and unpredictability in [the] judicial system which would undermine all litigants' expectations as to the finality of judgments rendered by the High Court."[13] The Appellate Division

5. Secretary's Order No. 2657 §§ 2(b), (4) (August 29, 1951), as amended, 1972.

6. Brief of American Samoan Government (hereinafter ASG Brief) at 6.

7. Brief of Secretary of Interior (hereinafter USG Brief) at 3.

8. USG Brief at 4.

9. *Nouata v. Pasene*, No. 18–1930 (H.C.T.D. June 9, 1931), Case App. 1, 20 (hereinafter *Nouata I*).

10. Brief of Appellant at 8–9.

11. *Nouata v. Pasene*, No. 18–1930 (H.C.T.D. Feb. 20, 1979), aff'd, No. 07–79 (H.C.A.D. July 11, 1980), Case App. at 21 (hereinafter *Nouata II*).

12. Case App. at 29.

13. *Id.* at 44.

affirmed the trial court's decision on the merits.[14]

The Church alleges that in response to the unfavorable ruling of the High Court, the Pualioa family resorted to self-help to gain possession of Malaeimi. In 1979, the Church filed a trespass action against members of the Puailoa family, who were allegedly "tearing down fences, destroying 'No Trespassing' signs, damaging property, and killing livestock" on Malaeimi.[15] The Puailoa family argued as a defense that Malaeimi was communal land, which Salataima had no right to sell, so that the Church's deed from her was invalid and the family was not guilty of trespassing. The Church argued that even if Salataima had no title to pass, it had acquired title through adverse possession.

The trial court found that the Church's deed was void for two reasons: Malaeimi could not have been the individual property of Salataima because it did not appear as freehold land on the record of Court Grants compiled in 1900, and a review of early court decisions contained references to Malaeimi as communal land. The court reasoned that *Nouata I* gave Salataima a life estate in the rents received from Malaeimi, but not a freehold title to the land. The trial court rejected the Church's claim of title by adverse possession on the ground that the Church had failed to occupy the land for the minimum number of years required by Samoan law.[16] The Appellate Division affirmed the trial court, rejecting the Church's argument that the *Nouata* cases were *res judicata* on the issue of title. The Appellate Division found the 1931 opinion in *Nouata I* to be ambiguous with respect to the ownership status of Malaeimi, and not, therefore, *res judicata* on the point. The appeals court concluded

that the trial court's decision that the land was communal was not clearly erroneous.[17] The Church petitioned the High Court for rehearing, but that petition was denied on the grounds that "Salataima had no title to pass." [18]

The Church then petitioned the Secretary of the Interior to reverse the decision of the High Court.[19] The Church argued that *Nouata I* had awarded exclusive fee ownership of Malaeimi to Salataima in 1931. According to the Church, "both the trial and appellate divisions of the High Court, in 1979 and 1980 respectively, acknowledged that the 1931 case had decided the ownership issue and had concluded that the land was individually owned by the widow Salataima." [20] As the Church now argues, the territorial court engaged in an "open and arbitrary effort to relitigate an issue it decided 50 years ago—involving the predecessors of the same parties—in order to reach a different result." [21]

The Secretary of the Interior declined to intervene in the dispute over ownership of Malaeimi. The Secretary explained that a decision to intervene in the judicial system of American Samoa "cannot be taken lightly," as any intervention might jeopardize the United States policy of "fostering greater self-government and self-sufficiency without disturbing the traditional Samoan cultural values." [22] Turning to the dispute over Malaeimi, the Secretary explained:

"As Secretary, I have held no hearing and read no briefs. To have done so, or to do so now, with a view toward overruling the High Court's decision, in what I perceive to be a highly complicated case, puts the Secretary in the position of an appellate court, superimposed over the

14. *Nouata v. Pasene,* AP No. 07–79 (H.C.A.D.) 1980, Case App. at 41.

15. Brief of Appellant at 14.

16. *Reid v. Puailoa* (hereinafter *Reid* ), No. 41–79 (H.C.T.D.), Case App. 67, 82.

17. *Reid v. Puailoa,* Nos. 14–82, 15–82, 16–82 (H.C.A.D.1983), Case App. at 83.

18. *Reid v. Puailoa,* AP Nos. 14–82, 15–82, 16–82 60(b) Order (H.C.A.D.1984), Case App. 103, 105.

19. Letter from the General Counsel for the L.D. S. Church to the Secretary of Interior, January 31, 1985, Doc.App. at 41–51.

20. *Id.* at 47.

21. Brief of Appellant at 40.

22. Doc.App. at 53.

duly constituted judiciary. Moreover, I am aware of no evidence that this case jeopardizes United States policy. Nor, does this case appear to present such a clear abuse of judicial discretion that intervention is dictated. For these reasons I choose not to intervene." [23]

Having failed to obtain relief from the courts of American Samoa or to enlist the intervention of the Secretary of the Interior, the Church filed this action against the Secretary in the United States District Court for the District of Columbia. In a variety of specific ways, appellant alleged that the Secretary, "through his agents, had failed to administer the government of American Samoa in accordance with the laws and Constitution of the United States." [24] The district court dismissed appellant's complaint for failure to state a claim upon which relief could be granted.

We affirm the order of the district court for the reasons set forth below.

## II

The Church's first argument is that it was denied an opportunity to prove that the High Court's decision in *Reid* deprived it of due process and took its property without compensation or public purpose. The Church argues that a local court ruling may violate due process if it deprives a party of a property right through a "perverse reading of the law," or if a judgment amounts to an "arbitrary or capricious exercise of power." [25] With respect to its taking claim, the Church argues that a court that commits an error that is "gross and obvious, coming close to the boundary of arbitrary action," may "bring about a

23. *Id.*

24. Brief of Appellant at 17.

25. *Id.* 23.

26. *Id.* at 24.

27. *Id.* at 26.

28. *Id.*

29. *Id.*

30. *Id.* at 35.

taking without due process of law by force of ... a judgment." [26]

The Church argued below that the Puailoa family's challenge to its deed was barred by the Samoan 20–year statute of limitations on actions for the recovery of real property, and by *res judicata.* By failing to recognize the rights that had thus vested in the Church, it is urged, the High Court "violated the Church's rights under both the due process and taking clauses of the Fifth Amendment." [27]

### A. *Statute of Limitations*

With respect to its statute of limitations claim, appellant argues that "[s]ince the Puailoa family asserted its claim to the land in *Reid* twenty-nine years after the Church had purchased the land, the [20–year] statute of limitations should have applied to bar that claim." [28] Appellant claims that "the High Court simply ignored the Church's argument, giving no reason or explanation in its opinion for not applying the statute." [29] The Church also complains that "the district court did not address the High Court's refusal to apply the 20–year statute of limitations" against the family's challenge to the title to Malaeimi.[30]

It is not at all clear that appellant made this argument to the High Court; it is clear, however, that the Church did not make the argument to the district court. The statute of limitations upon which appellant makes this argument is nowhere discussed in its papers below.[31] Consequently, it is not surprising that the district court did not address the argument. Not having been argued below, it is not properly before us either and we do not address it.[32]

31. Appellant's complaint alleges that the Church was improperly denied adverse possession on the basis of a 30–year durational occupancy requirement whereas a 20–year requirement was applicable to it. Confusion with this argument, which is renewed on appeal, *see infra,* may explain appellant's raising the statute of limitations argument at this late date.

32. We note only a question whether the statute would apply in any event because the family raised the issue of title as a defense to an action brought in trespass; this was not an "action brought for the recovery of real property" with-

## B. *Res Judicata*

Appellant next argues that the High Court committed "gross and obvious" error by refusing to accord *res judicata* effect to the judgment in *Nouata I*.[33] The Church asserts "[i]t is undisputed that the status and ownership of the land was decided in *Nouata I*," and insists that "the High Court in *Reid* was bound by its 1931 determination of the status and ownership of the leased land in *Nouata I*."[34] Additionally, since "[o]ver the next 50 years, everyone involved" treated *Nouata I* as having held that Salataima owned Malaeimi,[35] the High Court, we are told, erred in believing that the *Nouata I* decision was ambiguous and not a source of *res judicata*. Finally the Church argues that, even if *Nouata I* were ambiguous, under the rule of practical construction, the district court erred in not allowing the Church to put in evidence as to how the parties had construed it for the past fifty years.[36]

■ We conclude that *Nouata I* was ambiguous on its face with respect to ownership of Malaeimi, just as the High Court said in *Reid*.[37] On one hand, the *Nouata I* court described "that part of the Malaeima that is leased" to the Church as Salataima's "property"; yet, on the other hand, it said that she was entitled to the rents "during her lifetime" and thereafter to pass them by will "if the lease is still running" at her death. The former implies that she owned the land in fee, the latter that she owned the leasehold interest only. The *Reid* court resolved this ambiguity as meaning that Salataima had a leasehold interest while the family owned the underlying fee. This was no "arbitrary" refusal to apply *res judicata* in violation of due process.

We also conclude that the district court did not err by refusing to take factual evidence on the construction of the parties. Even if the "rule of practical construction" is to look to the way in which the parties have interpreted the judgment, it would not necessarily constitute clear error on the part of the territorial court to have dispensed with such evidence on the ground that it was fully capable of resolving this ambiguity of law. In any event, we are aware of no authority to suggest that the rule of practical construction here urged upon us is constitutionally required, as would clearly be implied if its rejection in American Samoa were held to deprive appellant of due process of law.

The Church argues that the district court committed other errors with respect to the doctrine of *res judicata*. It first argues that the district court was wrong to question "whether failure to apply *res judicata* is ever violative of the due process clause of the Constitution."[38] Supreme Court precedent, the Church argues, indicates that "arbitrary refusal to apply *res judicata* violates due process."[39] This point is moot, however, since we have held that the High Court in *Reid* did not *arbitrarily* refuse to give *res judicata* effect to *Nouata I*.

Appellant next argues that the district court relied erroneously upon the full faith and credit statute[40] to avoid "even reviewing the High Court's refusal to apply *res judicata*."[41] The district court did, at one point in its decision, indicate that it was bound to accord full faith and credit to the

---

in the literal ambit of the Samoan statute of limitations. The Church has not argued or shown that the statute of limitations for bringing an action to recover real property applies equally to bar a defense against a trespass action that questions a plaintiff's title.

**33.** Brief of Appellant at 34.

**34.** *Id.* at 29–30.

**35.** *Id.* at 31.

**36.** *Id.* at 41.

**37.** Case App. at 90.

**38.** Brief of Appellant at 35.

**39.** Brief of Appellant at 35, citing *American Railway Express Co. v. Kentucky*, 273 U.S. 269, 47 S.Ct. 353, 71 L.Ed. 639 (1927); *Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981).

**40.** 28 U.S.C. § 1738.

**41.** Brief of Appellant at 36.

High Court's decision as to "whether *res judicata* would be applicable to a question of territorial law." [42] Appellant argues that this case does not implicate the full faith and credit issue because it does not raise the same issues that the High Court decided in *Reid*. *Reid* related to trespass, *res judicata*, ownership, and title by adverse possession; this case relates to the High Court's arbitrary adjudication of those issues, as a violation of due process. Therefore, "in this action the full faith and credit statute does not even come into play." [43]

This argument is not really consequential. The district court went on to decide that "even were [it] to review the substance of the territorial court's holding in *Reid*, it would not conclude that [it] was clearly erroneous in its refusal to apply *res judicata*." [44] We do not reach this question ourselves. It is enough for us to note that while there is some force in appellant's full faith and credit argument, the fact remains that the district court did not rely on that statute.

## C. *Taking*

Appellant argues that the district court erred in denying its "taking" claim on the ground that a court cannot "take" property when it resolves a title dispute between private parties. The Church urges that any judicial action that meets the test of "gross" or "arbitrary" error raises a valid claim of judicial taking. Turning to the specifics of this case, the Church argues:

"[T]his case satisfies that standard because the same court that resolved the title issue against the Church in *Reid* had previously resolved the same issue in favor of the Church and its predecessor-in-interest in *Nouata I and II*. Thus, where a court finally resolves a title dispute in favor of one party and subsequently reopens that dispute and rede-

cides it in favor of the other party, after the first party has relied to its detriment on the first decision, such arbitrary court action raises a valid claim for a judicial 'taking' of the property." [45]

The question of whether courts, as opposed to legislative bodies, can ever "take" property in violation of the Fifth Amendment is an interesting and by no means a settled issue of law. [46] We have no occasion, however, to decide this issue today. Under appellant's own criteria, a judicial action cannot qualify as a "taking" absent "gross" or "arbitrary" error. If there was no such error in *Reid*'s denial of *res judicata* effect, as we have held, then there was no taking under appellant's own analysis. The due process and taking aspects of appellant's Fifth Amendment claims must, by appellant's own analysis, stand or fall together.

## III

The Church's second principle argument, as an alternative to its due process and taking claims, is that it had title to Malaeimi through adverse possession. In 1953, when the Church purchased Malaeimi from Salataima, the Samoan adverse possession statute required that a claimant occupy the property for twenty years. A later statute increased the occupancy requirement to thirty years. The Church argued that the later—and longer—occupancy requirement did not apply to its claim to Malaeimi, for reasons we need not detail. Appellant alleges that "it maintained open, exclusive, and unchallenged possession of the purchased land from 1953 to 1978," thereby satisfying the requirement that to gain title by adverse possession the claimant must occupy the property for twenty years.

The Church alleges that in its denial of rehearing in *Reid*, the High Court "tacitly accepted the Church's argument" that ap-

---

**42.** Memorandum Opinion at 18; Doc.App. at 19.

**43.** Brief of Appellant at 38.

**44.** Memorandum Opinion at 21; Doc.App. at 22.

**45.** *Id.* 42–43.

**46.** *See Hughes v. Washington,* 389 U.S. 290, 296–97, 88 S.Ct. 438, 442, 19 L.Ed.2d 530 (1967) (Stewart, J., concurring); *Robinson v. Ariyoshi,* 441 F.Supp. 559 (D.Haw.1977), *aff'd,* 753 F.2d 1468 (9th Cir.1985).

plication of the 30–year occupancy requirement to it "was clearly not valid," and that the 20–year provision remained in effect.[47] The Church argues that the High Court then resorted to an allegedly unconstitutional racial restriction barring alienation of land to non-Samoans to deny its claim of title through adverse possession.

In what the Church characterizes as an "after-thought," the High Court added that the dispute over the applicable occupancy requirement was academic because "the trial court could easily have concluded that the occupancy by the Church was never exclusive, an essential element of adverse possession."[48] The High Court found evidence in the record that members of the Puailoa family had "constantly attempted to assert their claims on the land, not only by petitions, protests and appeals to judges, senators and governors ... but by actual physical presence on the land in question."[49]

The district court concluded that the High Court denied the Church's adverse possession claim because it had not established exclusive possession, as well as on the basis of the racial limitation. The Church claims, however, that in doing so the district court erroneously "elevated [the] dictum" of the High Court that the Church never had exclusive occupancy into a factual finding, which was key to its conclusion that the High Court denied the adverse possession claim on an independent non-racial ground.[50] The Church also argues that the district court erred by deferring to the High Court's finding that the Church did not have exclusive possession, and by refusing to allow the Church to prove that it had in fact maintained exclusive possession of Malaeimi.

The Church argues that "the High Court in *Reid* may not evade federal court review by the simple expedient of inserting its 'untenable,' wholly unsupported dictum questioning exclusive possession. Nor may the district court avoid the constitutional issue by accepting the unsupported dictum as a 'finding.' The *Reid* decision clearly denied adverse possession on the basis of the racial alienation restriction, and that holding raises a constitutional issue cognizable in a federal court."[51] The Church asserts that it is entitled to a trial to prove that the *Reid* record contains no evidence to support the finding that it did not have exclusive possession of Malaeimi.

■ We hold that the district court was correct to read the *Reid* decisions to rely upon the racially restrictive land statute only in the alternative. The Samoan trial court rejected the Church's adverse possession claim on the basis of the 30–year statutory period (as to which it may have erred), and the High Court, in its opinion denying rehearing concluded that whatever the applicable period, the Church had not maintained exclusive possession for the necessary period of time. The High Court clearly indicated that the record would support a judgment based on lack of exclusive possession; it supplied an alternative ground to the one announced by the trial court, perhaps in order to avoid a constitutional confrontation over the race restriction. Whatever its motivation, however, we have no basis for treating the High Court's reading of the record and its conclusion of law with any less deference than we would pay, at this distance, to the trial court.

We note the obvious first: in its denial of rehearing, the High Court never reversed the trial court's application of the 30–year occupancy requirement.[52] Consequently, that interpretation of local law, while possibly erroneous, has never been overruled.

---

47. Brief of Appellant at 46.

48. *Id.*

49. Case App. at 109.

50. *Id.* at 47.

51. *Id.* at 50–51.

52. In its denial of rehearing in *Reid,* the High Court did state that "the trial court admittedly gave short shrift to appellant's claim of ownership by adverse possession. One cannot tell whether a 20–year or 30–year limit was considered." Case App. at 108. This statement, while curious in light of the trial court's explicit invocation of the 30–year rule, does not constitute a reversal of the trial court.

We find no evidence to support appellant's argument that the High Court "tacitly" agreed that the 30–year occupancy period "was clearly not valid."

Second, the High Court appellate division stated in *Reid* that communal land could never be taken by anyone—whether native or foreign—through adverse possession.[53] The High Court emphasized the status of Malaeimi as communal land when it analyzed the Church's adverse possession claim. If the land was not communal, the racial restriction on alienation would permit Samoans—but not foreigners—to claim title through adverse possession. But because the High Court had already held that Malaeimi was communal land and not ever the property of Salataima, it was clear that the land was not eligible for adverse possession by anyone. The Church argues that the High Court's statement was "plainly dictum" and in conflict with "numerous" prior holdings of the High Court that communal land *is* subject to adverse possession.[54] It is plain to us, however, that the High Court intended this ground for denial of the adverse possession claim as an alternative holding. The only prior decisions to which the Church directs our attention are all opinions of the High Court trial division.[55] Surely it cannot be seriously argued that the High Court appellate division is bound by opinions of the trial division.

▪ We conclude, then, that the original holding of the trial court that the statute "requires a 30 year occupancy ... [but t]hirty years had not passed before the Puailoa family brought their 1978 case of *Nouata*" was never reversed.[56] We also conclude that once the High Court found Malaeimi to be communal land, it was not eligible for taking by adverse possession, and that in any event the High Court concluded that the Church did not have *exclusive* occupancy regardless of whether the 20–year or 30–year rule applied. These alternative grounds make it unnecessary for us to reach appellant's constitutional attack on the racial restriction on alienation.[57]

## IV

Finally, appellant argues that the district erred in refusing to allow it to prove that the High Court of American Samoa lacks the independence and the finality of judgment that it asserts are necessary to afford it due process and equal protection of the law.

With regard to due process, the Church argues that the High Court of Samoa is utterly and impermissibly subservient to the Secretary of the Interior. The complaint alleges and the Church now emphasizes that the Secretary has "plenary" authority over the territorial judiciary, including the power to appoint the judges, to set their salaries, to remove them "for cause," and to review and reverse the decisions of the High Court.[58]

The district court did "not accept" the Church's claim that the "for cause" limitation on the Secretary's power of removal[59] was not a real limitation on the Secretary's discretion, but held that even if the Secretary had complete removal power, it would not violate due process in light of *Kalaris*

53. Case App. at 94 n. 1.

54. Reply Brief of Appellant at 22–23.

55. Brief of Appellant at 44 n. 19, citing *Stone v. Tiuali,* 3 A.S.R. 66 (H.C.T.D.1953); *Tuanaitau v. Paogofie,* 4 A.S.R. 375 (H.C.T.D.1963); *Lolo v. Heirs of Sekio,* 4 A.S.R. 477 (H.C.T.D.1964).

56. Case App. at 82.

57. The Secretary argues that appellant lacks standing to pursue this constitutional challenge since its "injury is not 'fairly traceable' to [the statute] because the Secretary would have refused to vacate the High Court's judgment even if it had not relied upon this statute," referring here to the "other grounds supporting the High Court's judgment on the adverse possession issue." USG Brief at 33–34. Regardless of whether one regards the issue as a matter of standing, there is no reason to pursue the constitutional issue once we have upheld the judgment below on a non-constitutional ground.

58. *See King v. Morton,* 520 F.2d 1140, 1144 (D.C. Cir.1975) (Secretary authorized to review decisions for conformity with constitutional requirements).

59. Am.Samoa Code § 3.1001.

*v. Donovan,* 697 F.2d 376, 397–98 (D.C. Cir.), *cert. denied,* 462 U.S. 1119, 103 S.Ct. 3088, 77 L.Ed.2d 1349 (1983). In that case, we rejected a similar challenge to the authority of the Benefits Review Board, which sits at the discretion of the Secretary of Labor but adjudicates private rights. The Church correctly notes, however, that the decisions of the Board in that case could be appealed to a federal court; as we said there, the " 'essential attributes of the judicial power' remain in the Article III courts, and the Board is simply an additional layer of administrative review." [60] The district court here noted the point, too, but concluded that appellant had simply failed to indicate why any greater degree of independence is required by due process for decision-making in American Samoa than "in other settings where Congress has delegated judicial or quasi-judicial authority." [61]

On appeal, the Church has argued that "[t]he gravamen of the due process challenge to the Samoan court system is that the High Court of American Samoa is not a real 'court' and that the Church is entitled to a hearing on the merits in a real court before being deprived of its vested property right." [62] Unlike the familiar prejudicial boards and agencies, that is, the High Court's "obvious administrative pressures and subservience to the Secretary are coupled with the total absence of appellate review by an independent tribunal, thereby leaving the potential for error and abuse totally unchecked, [and] the due process deficiency becomes apparent." [63] Thus, while the Church purports to concede that it is not entitled to an Article III court, inasmuch as an Article IV court may be assigned non-judicial duties, it nonetheless maintains that it is entitled to the judicial independence that is the hallmark of Article III, lest it be deprived of the due process to which it is entitled by the Fifth Amendment.

It does not require much explication of Congress' plenary authority over the territories, as provided in Article IV, to unhorse this claim. The Congress has delegated its judicial power with respect to American Samoa to the President, who has in turn delegated it to the Secretary. [64] Its authority to do so has been clear since *American Insurance Company v. 356 Bales of Cotton,* 26 U.S. (1 Pet.) 511, 546, 7 L.Ed. 242 (1828), which "has ever been taken to establish ... that in the territories cases and controversies falling within the enumeration of Article III may be heard and decided in courts constituted without regard to the limitations of that Article; courts, that is, having judges of limited tenure...." *Glidden Co. v. Zdanok,* 370 U.S. 530, 545, 82 S.Ct. 1459, 1470, 8 L.Ed.2d 671 (1962) (Opinion of Harlan, J.); *see McAllister v. United States,* 141 U.S. 174, 11 S.Ct. 949, 35 L.Ed. 693 (1891) (limited term for territorial judges); *United States v. Fisher,* 109 U.S. 143, 3 S.Ct. 154, 27 L.Ed. 885 (1883) (their salaries reduced). The Congress, that is, could have, so far as Article III is concerned, provided that the Secretary himself would exercise the judicial power in American Samoa. No doubt, the due process clause of the Fifth Amendment may qualify this prerogative in some way. The Secretary might not be able to exercise his authority, nor perhaps even to retain it in dormancy, in a case to which he is a party. But that is a far cry from this case. Here, there is no claim that the Secretary was interested in the outcome. So far as due process is concerned, therefore, he could have decided it himself and there can be no cause of action because the court that did so was subservient to him.

With respect to equal protection, the Church alleges that:

"The High Court of American Samoa is neither an Article III (constitutional) court, nor an Article IV (legislative) court. Rather, it is an administrative court operated by the Department of the

---

**60.** *Kalaris v. Donovan,* 697 F.2d at 399–400 (citation omitted).

**61.** Memorandum Opinion at 32; Doc.App. at 33.

**62.** Reply Br. at 26.

**63.** *Id.*

**64.** *See* note 2, *supra.*

Interior. As such, the High Court exists and operates under the direct control and supervision of the Secretary of the Interior." [65]

Appellant's purported distinction between an "administrative" and a legislative court is unfounded. When Congress creates a territorial court apart from Article III, it matters not whether it makes no provision for, delegates to the Executive Branch, or delegates to the Judicial Branch the power to review its rulings; [66] The Judicial Power simply is not implicated.[67] But we do not read appellant's complaint to depend utterly, in this regard, upon the distinction advanced, for it argues vigorously on appeal not for an absolute constitutional right of access to a court independent of the Executive, but for the relative right to be treated equally with the residents of the other territories.

In this regard, appellant points out that of all the territories, only in American Samoa are litigants denied both trial *and* direct review [68] in "an independent [Article I] or Article III court." [69] "Since residents of other U.S. territories can litigate their property claims in a court having both independence and finality of judgment," the Church argues, it has been denied equal protection of the law.[70] Furthermore, according to the Church, access to an independent court is a "fundamental right," denial of which can be justified only by a "compelling" interest, subject to strict scrutiny. Appellant argues that the district court erred by applying a "rational basis" test rather than some form of strict scrutiny to evaluate the constitutionality of the Samoan judicial system.

■ At the outset, we reject the claim that more than a rational basis is required in order to sustain the unique features of the Samoan judicial system as constitutional. It is clear that Congress, when it is acting under the authority of Article IV, "may treat [a territory] differently from States so long as there is a rational basis for its actions." [71] The Church's argument that more is required because we deal here with an arguably "fundamental right," *viz.*, access to an independent court, is unavailing. Regardless of whether such a right may be fundamental for other purposes, the Supreme Court long ago determined that in the "unincorporated" territories, such as American Samoa, the guarantees of the Constitution apply only insofar as its "fundamental limitations in favor of personal rights" express "principles which are the basis of all free government which cannot be with impunity transcended." [72] If access to an independent court for the adjudication of a land dispute were of such a fundamental nature, then—there being no real distinction between the High Court of Samoa and any other non-Article III court at least where no constitutional claim

**65.** Complaint Para. 27; Doc.App. at 130.

**66.** In fact, Congress has typically made the decisions of territorial courts reviewable in the Article III courts of appeal. *See* 28 U.S.C. § 41.

**67.** *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 64–65, 102 S.Ct. 2858, 2867–68, 73 L.Ed.2d 598 (1982). At most, it might be necessary to provide somewhere, if not on review then by way of collateral attack, an Article III forum in which to raise a constitutional claim. *See Bartlett v. Bowen*, 816 F.2d 695, 703 (D.C.Cir.1987) (dictum).

**68.** As in this case, that is, they are remitted to collateral attack in an independent, indeed an Article III, court.

**69.** Puerto Rico has an Article III district court, 28 U.S.C. § 119, appeals from which lie in the First Circuit. The other *overseas jurisdictions* have non-Article III territorial courts, from which appeals go to the various circuit courts of appeal. *See e.g.*, 48 U.S.C. § 1424b (judge for Guam to have 10 year term); 48 U.S.C.A. § 1424–2 (appeals from Guam to Ninth Circuit).

**70.** Brief of Appellant at 51.

**71.** *Harris v. Rosario*, 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980).

**72.** *Dorr v. United States*, 195 U.S. 138, 146–47, 24 S.Ct. 808, 811–12, 49 L.Ed. 28. *See Note, The Application of the American Constitution to American Samoa*, 9 J.Int'l L. & Econ. 325 (1974) (uncertain scope of application of Constitution to territories). To maintain that an independent judiciary is a *sine qua non* for "free government," of course, ignores the fact that in parliamentary democracies that do not have a written constitution, such as the United Kingdom, the legislature retains the power to review judicial decisions.

is involved[73]—it follows that there would be no place at all for the "exception from the general prescription of Art. III" for "territorial courts," which "dates from the earliest days of the Republic...."[74] We conclude, therefore, that access to a court independent of Executive supervision is not a fundamental right in the territories.

Is there a rational basis, then, for Congress' decision to preclude trial in or direct appeal to an independent court in American Samoa, and only in American Samoa, i.e., is there "any state of facts [that] reasonably may be conceived to justify it"?[75] The district court identified several factors that it thought might justify "[f]ailure to provide for direct review by an Article III court"[76]—a somewhat different situation than the one here challenged. Thus, that court pointed to "American Samoa's relatively small size, its geographical distance from any court of appeals, its desire for autonomy in local affairs, [and] the fact that it is the only territory without an organic act."[77] The Church, however, argues that the district court here "assumed facts" that were not true, and it offered to prove that there are other unorganized territories, smaller and more remote from the United States, that do have access to "a statutory or Article III court."[78] In other words, it says there is nothing unique about Samoa that justifies denying Samoan litigants access to an independent court, at least on appeal.

■ Appellant's offer of proof is beside the point, since we could assume the facts it offers to prove and we would still be constrained to uphold the judicial scheme applicable to Samoa as being rationally designed to further a legitimate congressional policy, *viz.*, preserving the Fa'a Samoa by respecting Samoan traditions concerning land ownership. There can be no doubt that such is the policy. First, the Instruments of Cession by which these islands undertook allegiance to the United States provided that the United States would "respect and protect the individual rights of all people ... to their land," and would recognize such rights "according to their customs."[79] Second, the Samoan Constitution expressly provides that "[i]t shall be the policy of the Government of American Samoa to protect persons of Samoan ancestry against alienation of their lands...."[80] Such transfers would inevitably spell the end of the Fa'a Samoa. Congress initially delegated "all civil [and] judicial" power over American Samoa to the Executive,[81] but after the Secretary had approved the present Constitution of American Samoa, Congress in 1983 provided that any amendments could be "made only by Act of Congress."[82] To some extent, therefore, Congress may be viewed as having ratified the Samoan Constitution, at least in principle.

Congress' policy of respecting Samoan traditions concerning land ownership is furthered by the special composition of the High Court in land cases, as provided by American Samoan statute law. Section 3.0220 of the American Samoa Code provides that ordinarily appeals to the High Court "shall be held before 3 justices and 2 associate judges," but if there is a difference of opinion among the members of the panel, "the opinion of 2 of the justices shall prevail." Am.Samoa Code § 3.0221. In cases involving "land or matai title," however, "the opinion of the majority of the

**73.** *See* text and notes at nn. 64–65, *supra.*

**74.** *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 64, 102 S.Ct. 2858, 2868, 73 L.Ed.2d 785 (plurality opinion).

**75.** *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), *quoting McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

**76.** Memorandum Opinion at 36; Doc.App. at 37.

**77.** *Id.*

**78.** Brief of Appellant at 61.

**79.** Respectively, Cession of Tutuila and Aunuu (1900), Supp.App. at 1, and Cession of Manu'a Islands (1900), *id.* at 2, both "accepted, ratified, and confirmed" by the United States. *See* 48 U.S.C. § 1661(a).

**80.** Rev. Const. of Am.Samoa, Art. I § 3.

**81.** 48 U.S.C. § 1661.

**82.** 48 U.S.C. § 1662a.

five judges shall prevail and shall be recorded by the clerk as the opinion and decision of the court." *Id.* As the district court noted, "[T]he distinction is made presumably because associate judges"—who are typically local matai, knowledgeable in the Fa'a Samoa but not necessarily educated in United States law—"are familiar with local land law and customs." [83]

That Congressional policy could be frustrated if the High Court's judgments in such cases were reviewed by one of the circuit courts of appeal, which are Article III courts but which lack expertise in Samoan law and culture, is a reasonable judgment well within the province of the legislature. The courts of the various territories whose judgments are subject to review in the courts of appeal are not, so far as we are informed, charged with any comparable duty to follow local customary law instead of prevailing common law.

It is likewise reasonable for the Congress to decide against either giving the High Court judges lifetime appointments under Article III, or at least making the High Court independent of the Secretary. As to the former, we note that Associate Judges of the High Court are now appointed by the Governor, upon recommendation of the Chief Justice, subject to confirmation by the territorial Senate; [84] they are subject to removal for cause by the Chief Justice, who is appointed (and removable for cause) by the Secretary.[85] The Governor's ability to rotate among the various matai the burdens and benefits of being an Associate Judge would be lost, of course, with life tenure. Lost, too, would be the power of removal—short of a burdensome impeachment by the House and conviction by the Senate of the United States—which is of particular importance in a context where judges are selected because they are local chiefs but they may have no training in the law. As to the latter alternative, a High Court that is neither reviewed by an Article III court *nor* accountable to the Secretary would be more rather than less independent than the courts of any other territory. While it would not have been unreasonable to have provided for appeal to an Article III court with its scope of review appropriately limited in matters of local land law, we cannot say that it was unreasonable instead to allow the Secretary—who has general responsibility for the governance of American Samoa—to retain authority over the High Court and to remit a litigant to suit against the Secretary insofar as he may fail to keep the High Court within constitutional bounds.

### VII

In summary, the errors alleged in the Samoan court proceedings did not constitute gross error or arbitrary action in violation of the Fifth Amendment. While there may have been a simple legal error with respect to the durational occupancy requirement for adverse possession, such an error of local law, if it was an error, is the inheritance of fallible human institutions, not a failing of constitutional dimensions. Adequate and independent territorial law grounds were invoked to deny the Church's claim to adverse possession, so as not to implicate either the race-based alienation statute or the High Court's equivocal finding on appeal that the Church may not have had exclusive possession. Finally, the Church was not denied due process of law because Congress put the court system of American Samoa under authority of the Executive Branch; nor was it denied equal protection since Congress, exercising its authority over the territories, did not lack a rational basis on which to justify differences between the courts of American Samoa and those in the States or the other Territories.

The order of the district court is therefore

*Affirmed.*

---

83. Memorandum Opinion at 30 n. 28; Doc.App. at 31. *See Comment, Some Observations on the Judiciary in American Samoa,* 18 UCLA L.Rev. 581, at 584–85 (1970).

84. *See* Am.Samoa Code § 3.1004.

85. *See id.* at § 3.1001.