**Maria GUTIERREZ and Ramon Gutierrez, Plaintiffs,**

v.

**Otis R. BOWEN, M.D., Secretary of Health and Human Services, Defendant.**

**No. 87 Civ. 0952 (MBM).**

United States District Court, S.D. New York.

Jan. 3, 1989.

**1052**

Marc Finkelstein, Jorge Luis Vitureira, Law Student Intern, BLS Legal Services Corp., Senior Citizen Law Office, New York City, for plaintiffs.

Kathleen A. Zebrowski, Sp. Asst., U.S. Atty., Annette H. Blum, Chief Counsel–Region II, Peter G. O'Malley, Asst. Regional Counsel, New York City, for defendant.

### OPINION AND ORDER

MUKASEY, District Judge.

Plaintiffs Maria and Ramon Gutierrez have sued under §§ 205(g) and 1631(c)(3) of the Social Security Act, as amended, 42 U.S.C. §§ 405(g) and 1383(c)(3) (1982 & Supp. III (1985)), to undo defendant Secretary of Health and Human Services' determination that plaintiffs are not eligible for Supplemental Security Income ("SSI") benefits because they have excess resources. Both sides now move for judgment on the pleadings, pursuant to Fed.R.Civ.P. 12(c). For the reasons set out below, I grant defendant's motion, finding that the Secretary's decision comports with due process and is based on substantial evidence.

### I.

The factual controversy here is straightforward, but it raises a hornet's nest of legal issues. On November 8, 1984, plaintiffs filed an application for SSI benefits based on their age. Plaintiffs received SSI benefits amounting to $12 a month, plus Medicaid eligibility and payment of their Medicare premiums, until a computer check of records maintained by the Internal Revenue Service led to the discovery of previously undisclosed assets. The search uncovered a money market account in Maria Gutierrez's name worth over $11,000. As SSI provides a ceiling of $2,400 in resources, plaintiffs' SSI benefits were halted beginning February 1986.

Thereafter, plaintiffs sought reconsideration of the December 18, 1985 decision, contending that the money belonged to Mrs. Gutierrez's sister, Maria Hernandez Mallol, who lives in the Dominican Republic, and that she never used the money. This petition was also denied. Plaintiffs then requested a hearing, which was held on May 1, 1986 before Administrative Law Judge ("ALJ") Henry L. Pfeiffer. At the hearing, documentary evidence on the money market account showed that on December 24, 1982 funds from plaintiffs' joint account were transferred to a money market account in Maria Gutierrez's name. The activity in this account was as follows:

| Date | Transaction | Amount |
| --- | --- | --- |
| 12/24/82 | Deposit | $5,000.00 |
| 2/10/83 | Deposit | $3,037.18 |
| 9/12/84 | Deposit | $2,500.00 |
| 11/13/84 | Withdrawal | $ 700.00 |
| 12/03/84 | Withdrawal | $1,000.00 |
| 1/04/85 | Withdrawal | $ 500.00 |
| 1/04/85 | Deposit | $ 257.00 |
| 5/24/85 | Deposit | $1,100.00 |
| 6/25/85 | Deposit | $ 20.00 |
| 7/12/85 | Deposit | $ 20.00 |
| 8/03/85 | Deposit | $ 50.00 |
| 8/14/85 | Deposit | $ 20.00 |
| 9/04/85 | Deposit | $ 20.00 |
| 9/12/85 | Deposit | $ 20.00 |
| 9/30/85 | Deposit | $ 10.00 |
| 10/03/85 | Deposit | $ 20.00 |
| 10/11/85 | Deposit | $ 20.00 |
| 10/23/85 | Deposit | $ 20.00 |
| 11/02/85 | Deposit | $ 20.00 |
| 11/10/85 | Withdrawal | $ 450.00 |
| 11/21/85 | Withdrawal | $9,000.00 |
| 11/22/85 | Withdrawal | $2,397.44 |

On November 22, 1985, Maria Gutierrez closed the money market account and opened a savings account of $1,400 in trust for her daughter, Elba Gutierrez.

At the hearing, plaintiffs presented a letter dated December 6, 1985, from Maria Hernandez Mallol to her sister, acknowledging receipt of $11,362.74 and thanking Mrs. Gutierrez for depositing the money for her. (Administrative Transcript ("Tr.") at 101) By letter dated March 31, 1986, Ms. Petronila Gomez stated that she gave Mrs. Mallol the amounts of $700.00 and $1800.00 in cash, sent by Mrs. Mallol's sister, Mrs. Gutierrez, thus accounting for two of the several withdrawals made before the money market account was closed.

Furthermore, Maria Gutierrez testified that she opened the money market account for her sister and that various people would bring money from Mrs. Mallol for deposit. She testified that the reason her

sister wanted her money in an American bank was that she had been planning to come to the United States and that it was unsafe to keep money in one's home in Santo Domingo. (Tr. at 29, 35) She stated that her sister got this money from her children. (Tr. at 27) When questioned by the ALJ why her sister would send her money through friends in amounts of $20, she responded that her sister "had to wait until her friends came because this situation is banned in Santo Domingo." (Tr. at 26–27)

Mrs. Gutierrez explained that she never withdrew money from the account for herself, but, rather, withdrew the money when her sister needed it. She did not know why her sister requested the withdrawals; she simply gave Ms. Gomez the cash to bring to her sister whenever requested. She testified that she gave Ms. Gomez $700 in November 1984, $1,800 in December 1984 and approximately $11,000 when the account was closed in November 1985. She could not, however, remember the $500 withdrawal on January 4, 1985. She stated that she closed the account because the Social Security Administration ("SSA") had notified her of this problem. Plaintiffs not only lost their SSI benefits for the period the money market account was open, but also, because they transferred the money to Mrs. Mallol without receiving fair value in return, were precluded from receiving SSI benefits for an additional period of 24 months pursuant to 20 C.F.R. § 416.1246 (1988).

The ALJ found for plaintiffs on April 25, 1986, concluding that "the funds in the money market account belonged to the claimant's sister, Maria Hernandez Mallol...." (Tr. at 16) After this decision, Regional Commissioner Peter P. DiSturco wrote a memorandum requesting that the Appeals Council ("the Council") reopen the decision. In support of his request, he stated that "[l]egally, she had sole access to the account and could have liquidated it at any time. Also, the claimant obviously concealed her bank accounts until the IRS Interface surfaced. She closed the money market account after notification of suspension of her SSI benefits." (Tr. at 131)

By letter dated July 28, 1986, the Council notified plaintiffs that it was reopening the ALJ's decision pursuant to 20 C.F.R. § 416.1488, which provides that a decision may be reopened within two years after the date of the initial pre-hearing determination for good cause as defined in 20 C.F.R. § 416.1489. The good cause relied upon was that "the evidence which the [ALJ] considered clearly shows on its face that an error was made in his decision." (Tr. at 173) Specifically, the Council stated that

"[r]egardless of whether funds in the money market account were yours, you alone had legal access to the account. Therefore, in the absence of persuasive legal argument or evidence to the contrary, the Appeals Council proposes to find that you had resources in excess of the allowable limit, that you transferred those resources at less than fair market value to establish continuing eligibility for supplemental security income and that, accordingly, the resources continue to be countable for 24 months after disposition."

(Tr. at 173) Plaintiffs submitted a brief in opposition to the reopening, contending, *inter alia,* that the Council had no authority to reopen a decision beyond the sixty-day review period following the ALJ decision, as set forth in the regulations. Thereafter, on December 12, 1986, the Council issued its final decision reversing the ALJ's determination.

Plaintiffs then filed this suit. They now contend: (1) the Secretary has not demonstrated the requisite "good cause" under the regulations; (2) the Secretary has no statutory authority to reopen decisions past the sixty-day review period; (3) such reopening violates substantive and procedural due process because of lack of finality and inadequate notice; (4) if the reopening was proper, the Secretary's decision lacked substantial evidence because (a) the documentary evidence did not rebut Mrs. Gutierrez's testimony, and (b) the Secretary failed to apply the appropriate state law on ownership of an individual account.

## II.

■ The first task here is to decide whether the Council's action complies with the regulation's requirement that a reopening for "good cause" involve a situation where "[t]he evidence that was considered in making the determination or decision clearly shows on its face that an error was made." 20 C.F.R. § 416.1489(a)(3). If the error in the ALJ's determination was not error on the face of the record, then I need not decide whether the regulations in fact allow such reopenings and whether the regulations are constitutional. In reviewing the Council's determination that the ALJ's decision was erroneous on the face of the record, this court undertakes plenary review of the administrative record, just as, in an analogous situation, the Court of Appeals would review *de novo* a determination by the district court that an administrative decision was based on substantial evidence. *Cf. Havas v. Bowen,* 804 F.2d 783, 785 (2d Cir.1986).

Plaintiffs first claim that the Council's reopening violated 20 C.F.R. § 416.1489(b), which provides that a change in legal interpretation is not good cause for reopening a previous decision. In its opinion, the Council contended that, while 20 C.F.R. § 416.1201(a), which provides that a resource is counted if the individual has the "right, authority or power to liquidate" it, may be open to interpretation when resources are jointly owned, the regulation is not open to interpretation when an account is individually owned. Plaintiffs claim that this statement announces a new legal rule, namely that individually owned accounts will always be considered a resource of the person named on the account. Plaintiffs, however, answer their own charge by also citing a recent decision in which the Council held that, even though a claimant's name was on an account, the evidence demonstrated that the funds in the account actually belonged to her son. It is clear, then, that the case at hand worked no change in legal interpretation. In fact, the Council's decision stated explicitly that it was not announcing a new legal principle.

In fact, if anything, the Council's statement that the regulations are not open to interpretation in connection with an individual account seems to be a response to claimant's argument, also cited in the opinion, that case law shows intent is controlling and thus that the ALJ's credibility findings should be accorded substantial deference. In their brief, plaintiffs had argued that the intent of the owners of a bank account should control, citing *Owens v. Heckler,* 748 F.2d 1511 (11th Cir.1984), a case involving joint owners of a bank account. They argued that the ALJ credited Mrs. Gutierrez's account that she never intended to keep the money, and that this finding should receive deference. The Council's statement about individually owned accounts simply distinguished *Owens* as involving jointly owned accounts rather than the individually owned account at issue here. This reading becomes even more apparent when one considers that, to the extent intent was not at issue because this case involves an individual account, the ALJ's credibility findings would not be accorded the usual standard of deferential review by the Council. Therefore, the Council's comments seem more directed at rebutting the claimant's legal arguments than announcing a new legal interpretation.

Plaintiffs argue also that the Council reopened solely because the ALJ's determination was based on legal error. They claim that the Council held that an account with an individual's name on it perforce must be within the sole control of that individual. To demonstrate this proposition, plaintiffs seize on a sentence in the letter the Council sent plaintiffs on July 28, 1986 notifying them that their case was being reopened: "[r]egardless of whether funds in the money market account were yours, you alone had legal access to the account." (Tr. at 173) Plaintiffs would thus embroil this court in the ongoing debate among several courts whether legal error constitutes "error on its face." *Compare Fox v. Bowen,* 835 F.2d 1159, 1163 (6th Cir.1987) (holding that legal error is "error on its face") *with George By George v. Schweiker,* 563 F.Supp. 888, 891 (D.Minn.1982) (holding that legal error is not "error on its face").

The sentence plaintiffs cite is taken out of context. As the next sentence in the paragraph demonstrates, the Council was not overturning the decision merely because of legal error, but largely because there was no evidence supporting the ALJ's decision. Thus, the sentence reads: "Therefore, in the absence of persuasive legal argument or *evidence to the contrary*, the Council proposes to find that you had resources in excess of the allowable limit...." *Id.* This is borne out in the Council's decision wherein it cites extensive documentary evidence which it claims the ALJ failed to consider and which it argues conclusively proves that Mrs. Gutierrez's story was not credible. (Tr. at 10)

Of course, the Council reversed also because of legal error. Specifically, the Council faulted the ALJ for failing to consider 20 C.F.R. § 416.1201(a), which provides that a resource is attributed to the claimant if the individual has the right, authority, or power to liquidate it. Nevertheless, it is clear from the Council's decision that its opposition to the ALJ's decision centered on his failure to consider all the documentary evidence—and that this more than sufficed to require reversal. Thus, I need not reach the issue whether legal error alone constitutes "error on its face," as the Council's decision was obviously not predicated solely on any legal error by the ALJ.[1] Although Mrs. Gutierrez testified that she opened the account with her sister's money, the signature card for the account showed that it was opened with a $5,000 transfer from a joint account of plaintiffs held in trust for their daughter Elba Gutierrez. An account was opened by Mrs. Gutierrez in trust for her daughter in the amount of $1400 the same day she closed the money market account and supposedly sent the entire balance to her sister. Finally, the Council noted that plaintiffs had stated on two forms that their names did not appear on any individual or joint accounts.

In addition to the documentary evidence listed above which contradicts Mrs. Gutier-

rez's story, there is the sheer implausibility of individuals bringing $20 and even at one point $10 at two-week intervals. Finally, Mrs. Gutierrez's story is further contradicted by the fact that a withdrawal and deposit occurred on the same day—January 4, 1985. Accepting Mrs. Gutierrez's story, one traveller from Santo Domingo would have had to arrive with a request from her sister to withdraw $500 and another would have had to arrive—perhaps delayed in travel—the very same day with $257 for deposit. This strains credulity. It is not a surprise that, of the various withdrawals from the account, Mrs. Gutierrez conveniently could not remember this one at the hearing, as plaintiffs concede in their brief. *See* Memorandum of Law in Support of Plaintiffs' Motion for Judgment on the Pleadings at 42. As the Supreme Court wrote in *Anderson v. City of Bessemer*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985), "[d]ocuments or objective evidence may contradict the witness' story; or the story may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the [reviewing court] may well find clear error even in a finding purportedly based on a credibility determination." The Council thus correctly determined that the decision constituted "clear error." Even apart from any claimed legal error, the factual error alone would more than warrant reversal.

Applying the analogous federal court standard of "clearly erroneous," I agree with the Council that the evidence in this case leaves one with "the definite and firm conviction that a mistake [was] committed [by the ALJ]." *Anderson*, 470 U.S. at 573, 105 S.Ct. at 1511 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).

### III.

#### A. *The Regulatory Thicket*

The next question is whether the regulations allow the Council to reopen decisions

---

**1.** The Council also claimed that the decision could be reopened under the new and material evidence provision. I need not reach that con-

tention as I find adequate evidence of a clear "error on its face" in the ALJ's decision.

for good cause within two years of the initial pre-hearing determination. This issue has confounded both circuit courts and district courts for years, but their accrued wisdom offers guidance in understanding admittedly perplexing regulations.

The pertinent regulations are set out in the margin.[2] The Council has explicit authority to review a case sixty days after an ALJ's decision. After that period, however, the regulations as revised in 1980 confer no explicit authority to reopen a case. Interestingly, prior to 1980, the regulations clearly gave the Council the right to reopen on its own initiative after the sixty-day limit, both for SSI benefits and for disability benefits. *See* 20 C.F.R. §§ 404.1487 *et seq.* (1978). The 1980 revised regulations no longer give the Council this right, but the legislative history of the 1980 revisions recites that "no substantive changes have been made," although "several provisions have been clarified."

*See* Fed.Reg. 52078 (1980). Thus, the regulations changed radically in their text, while their legislative history proclaimed that no change was intended.

Courts have reached varied results trying to hack their way through the regulatory thicket. Because the 1980 regulations on reopening speak only of "you," and thus seem to limit reopening to claimants, one court has questioned whether the Council may reopen at all. *De Long v. Heckler*, 771 F.2d 266, 267–68 (7th Cir.1985) (Posner, J.) (dictum). However, certain provisions realistically would be utilized only by the Council: most glaringly, the fraud provision, 20 C.F.R. § 416.1488(c), leading other courts to find that the Council in fact may reopen. *Fox*, 835 F.2d at 1163; *Munsinger v. Schweiker*, 709 F.2d 1212, 1215 (8th Cir. 1983). *Accord Zimmerman v. Heckler*, 774 F.2d 615, 617 (4th Cir.1985). On the other hand, the provision that permits reopening within one year after an initial

## 2. APPEALS COUNCIL REVIEW

**§ 416.1467 Appeals Council review—general.**
If you or any other party is dissatisfied with the hearing decision or with the dismissal of a hearing request, you may request that the Appeals Council review that action. The Appeals Council may deny or dismiss the request for review, or it may grant the request and either issue a decision or remand the case to an administrative law judge.....

. . . .

**§ 416.1469 Appeals Council initiates review.**
Anytime within 60 days after the date of a hearing decision or dismissal, the Appeals Council itself may decide to review the action that was taken. . . .

**§ 416.1470 Cases the Appeals Council will review.**
(a) The Appeals Council will review a case if—
(1) There appears to be an abuse of discretion by the administrative law judge;
(2) There is an error of law;
(3) The action, findings or conclusions of the administrative law judge are not supported by substantial evidence; or
(4) There is a broad policy or procedural issue that may affect the general public interest. . . .

### REOPENING AND REVISING DETERMINATIONS AND DECISIONS

**§ 416.1487 Reopening and revising determinations and decisions.**
(a) *General.* Generally, if you are dissatisfied with a determination or decision made in the administrative review process, but do not re-

quest further review within the stated time period, you lose your right to further review. However, a determination or a decision made in your case may be reopened and revised. After we reopen your case, we may revise the earlier determination or decision.
(b) *Procedure for reopening and revision.* You may ask that a determination or a decision to which you were a party be revised. The conditions under which we will reopen a previous determination or decision are explained in § 416.1488.

**§ 416.1488 Conditions for reopening.**
A determination, revised determination, decision, or revised decision may be reopened—
(a) Within 12 months of the date of the notice of the initial determination, for any reason;
(b) Within two years of the date of the notice of the initial determination if we find good cause, as defined in § 416.1489, to reopen the case; or
(c) At any time if it was obtained by fraud or similar fault.

**§ 416.1489 Good cause for reopening.**
(a) We will find that there is good cause to reopen a determination or decision if—
(1) New and material evidence is furnished;
(2) A clerical error was made; or
(3) The evidence that was considered in making the determination or decision clearly shows on its face that an error was made.
(b) We will not find good cause to reopen your case if the only reason for reopening is a change of legal interpretation or administrative ruling upon which the determination or decision was made.

pre-hearing determination "for any reason" would seem to eviscerate the review provisions in §§ 416.1469–70 which permit the Council to review within sixty days after an ALJ's decision for specified reasons, prompting still another court to hold that the Council may not reopen cases after sixty days. *McCuin v. Secretary of Health and Human Services*, 817 F.2d 161, 170 (1st Cir.1987). *Accord Powell v. Heckler*, 789 F.2d 176, 179 (3d Cir.1986); *Hatfield v. Bowen*, 685 F.Supp. 478 (W.D. Pa.1988); *Everhart v. Bowen*, 694 F.Supp. 1518, 1521 (D.Colo.1988); *George by George*, 563 F.Supp. at 890.

The Eleventh Circuit has attempted to resolve the contradiction between the legislative history and the text of the regulations, and the anomalies within the text of the regulations apart from the legislative history, by holding that, although SSA may reopen cases, only that component of SSA which had made the decision or which had the decision properly before it for review may do so. *Butterworth v. Bowen*, 796 F.2d 1379 (11th Cir.1986). But the First Circuit has rejected this alternative because it embodies distinctions which are not in the regulations and effectively rewrites the regulations, a task best left to the legislature. *McCuin*, 817 F.2d at 170–71.

A recent Fifth Circuit decision, *Cieutat v. Bowen*, 824 F.2d 348, 355–56 (5th Cir. 1987), demonstrates that the regulations permitting the Council to reopen within one year "for any reason," 20 C.F.R. § 416.1488(a), or within two years for "good cause" as defined, 20 C.F.R. §§ 416.-1488(b) and 1489, do not in practice eviscerate the regulation that permits the Council to seek review for specified reasons within sixty days of an ALJ decision. 20 C.F.R. § 416.1469. The *Cieutat* panel noted that the sixty-day time period during which the Council may review a case on its own motion runs from the date of the ALJ's hearing decision. 20 C.F.R. § 416.1469. By contrast, the one- and two-year periods within which the Council may reopen a case begin on the date the claimant is sent notice of the initial determination on his application for benefits. 20 C.F.R. § 416.1488. Because of the length of time between an initial determination and the final ALJ decision, the one-year or two-year review period following initial notice could expire before the sixty-day reopening period following the ALJ decision. Accordingly, the two provisions can coexist without contradiction. Several district courts have adopted this reasoning, including two in this Circuit. *Campbell v. Bowen*, No. 87 Civ. 2229 (E.D.N.Y. June 2, 1988) [1988 WL 68813]; *Fowler v. Secretary of Health and Human Services*, No. 87 Civ. 0056 (E.D.N.Y. April 21, 1988) [1988 WL 46109]; *Gerstein v. Bowen*, 680 F.Supp. 1200, 1207–08 (N.D.Ill.1988). The Second Circuit has not yet spoken on this issue.

## B. *The Standard of Review*

■ As they do about most everything else, the parties disagree about the standard of review I must apply to the Secretary's interpretation of these regulations. Defendant asserts that the Secretary's interpretation should be accorded substantial deference. *See Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980); *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); *see also Town of Huntington v. Marsh*, 859 F.2d 1134, 1138 (2d Cir.1988). As the Court explained in *Bowles*, 325 U.S. at 414, 65 S.Ct. at 1217, "a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt.... [T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." Plaintiffs cite *McCuin* and *Powell* for the proposition that agency interpretations command only minimal deference when they involve legal issues not within the agency's particular expertise. If, as the court put it in *McCuin*, what is at issue here is "the fairness of the way in which legal and factual issues are resolved, the finality of judgment and due process of law," 817 F.2d at 168, those are not subjects on which this particular Article III court would reflexive-

ly defer to the Secretary of Health and Human Services.

Although one commentator has argued that an administrator's interpretation of his agency's regulations should generally be accorded great deference, largely because the administrator is "likely to know more about the background of intent that went into the regulation," 2 K. Davis, *Administrative Law Treatise* § 7.22 at 107 (2d Ed. 1979), the Second Circuit has apparently followed the rule that less deference is accorded an agency's interpretation when the regulations at issue deal with matters not within the agency's specialized knowledge. In *Bersani v. Robichaud,* 850 F.2d 36, 45 (2d Cir.1988), the court assumed, without deciding, that less deference was warranted if a rule treats matters outside the special expertise of the agency. *But see Pappas v. Bowen,* 863 F.2d 227, 230 (2d Cir.1988) (court granted traditional deference even though the issue concerned the Secretary's method of calculating attorneys' fees in social security cases, hardly a matter within SSA's expertise). Exercising prudence in plaintiff's favor, I will review the Secretary's interpretation of the regulation with less deference, because these regulations engage issues not particularly within the expertise of the agency, as the *McCuin* court correctly pointed out.

### C. *The Standard Applied*

■ Plaintiffs advance two arguments to counter the compelling analysis in *Cieutat* and other cases upholding the Secretary's interpretation. First, plaintiffs claim that those cases involved the reopening provisions for disability, not SSI, and that the SSI regulations include only one section, the one relating to fraud, which the Council might be expected to invoke as the basis for reopening, whereas the disability provisions include ten others. Therefore, plaintiffs reason, the Council may reopen disability awards but not SSI awards. But whether there are eleven sections or one that might be invoked by the Council, the regulations must be read so that no section is disregarded, regardless of which section provided the basis for reopening claimants'

case. *See, e.g., Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 630–31, 93 S.Ct. 2469, 2483–84, 37 L.Ed.2d 207 (1973). Realistically, most accusations of fraud will be directed against claimants; thus, the practical effect of holding that only claimants are allowed to reopen would be to nullify the fraud provision, 20 C.F.R. § 416.1488(c). Moreover, contrary to the thrust of plaintiffs' argument, if anything, the SSI reopening provisions seem more reasonable than the disability reopening provisions. The disability regulations allow reopening for four years with good cause; the SSI regulations limit reopening to two years. Otherwise, the two sets of regulations largely track each other. The *Cieutat* court found that "[t]he same analysis applies" for both sections. 824 F.2d at 353 n. 5. I agree.

Finally, plaintiffs would distinguish *Campbell,* because plaintiff there had not yet received any benefits when the Secretary reopened the ALJ decision, and thus she had "not suffered any prejudice." *Campbell,* No. 87 Civ. 2229, slip op. at 8. Here, by contrast, plaintiffs had already been receiving SSI benefits and thus have suffered prejudice by having their benefits first terminated, then reinstated after the favorable ALJ decision, and then terminated again after the Council reopened and reversed. A burdensome result in a particular case, however, is not properly part of an analysis of the reasonableness of regulations. Moreover, whatever inequity might result in particular circumstances can be cured by another group of regulations, 20 C.F.R. §§ 416.550–55, which allows for waiver of recovery of any overpayment where the individual was without fault and such recovery would "[d]efeat the purpose of title XVI, or ... [b]e against equity or good conscience, or ... [i]mpede efficient and effective administration of title XVI due to the small amount involved." 20 C.F.R. § 416.550(b). There is no indication that plaintiffs have availed themselves of these provisions.

For the above reasons, I find the Secretary's interpretation of these regulations— namely, that the Council may reopen a case

for good cause—reasonable and appropriate. However, I join the Sixth Circuit panel in *Fox*, 835 F.2d at 1163, in applauding SSA's proposal to revise the regulations so as to grant the Council explicit authority to reopen.

## IV.

### A. *Plaintiffs' Constitutional Arguments*

■ Having determined that the Secretary's interpretation of the regulations is correct, I turn now to plaintiffs' constitutional arguments. The Fifth Amendment guarantees citizens the right not to be deprived of "property, without due process of law." Plaintiffs advance essentially two claims of constitutional infirmity: the first, that the Council's ability to reopen a determination robs claimants of their right to a decision that is final and binding, engages both substantive and procedural due process concerns; the second, that claimants were not properly notified that the Council could reopen cases for up to two years for good cause, raises only a procedural due process issue.

Curiously, few of the court decisions previously mentioned included constitutional challenges to these regulations. In fact, before *McCuin*, these due process claims apparently had not been raised, even during the pre–1980 period when the Council had explicit authority to reopen cases. Nevertheless, in *McCuin*, the First Circuit found both of these alleged constitutional infirmities determinative. Relying on Supreme Court cases holding res judicata and collateral estoppel principles applicable to agency determinations, the court held that the Council's right to reopen violates due process because it "takes away the finality that adjudication normally affords." *McCuin*, 817 F.2d at 172. The Secretary sought to distinguish those Supreme Court cases as having dealt with new proceedings, whereas the regulations at issue deal with reopening—a later stage of a single proceeding. But the court rejected this contention, finding that the Council's ability to act as both prosecutor and judge gave it an "extraordinary reserve power" to reopen cases for a significant period of time and thus blurred the distinction between new proceedings and mere reopenings. 817 F.2d at 172.

The *McCuin* court found that this lack of finality spawned a second violation of procedural due process: "[T]he impossibility of giving … recipients fair notice of the Secretary's intentions." 817 F.2d at 172. The notice sent to McCuin, the same as the notice sent to plaintiffs here, was found inadequate because, although it stated explicitly that the Council could review within sixty days, it left vague whether the Council could reopen after that point. Moreover, the notice left out the possibility of claimant-initiated review, an omission which "alone would appear to be grounds for invalidating the notice." 817 F.2d at 173. In sum, the court determined that the notice violated procedural due process.

Since *McCuin*, several district courts have addressed the constitutional issues raised here. In *Hatfield*, 685 F.Supp. at 481–82 and *Everhart*, 694 F.Supp. at 1522–23, the courts followed the First Circuit in finding the reopening provisions unconstitutional. One district court in this Circuit, however, has upheld the regulations against constitutional attack, *Fowler*, No. 87 Civ. 0056, as has a district court in Illinois, *Gerstein*, 680 F.Supp. at 1208–09.

Plaintiffs' case was reopened under the two-year "good cause" regulation, not the one-year "for any reason" regulation; accordingly, the question of constitutionality is limited to the regulation at issue. Because the one-year provision was not at issue on the facts of *McCuin*, I reject outright the portions of *McCuin* that would seem to invalidate that provision. *See McCuin*, 817 F.2d at 174. Moreover, the constitutional question here is further limited by the extent of the injury claimant suffered, arising from reopening of plaintiffs' case slightly more than three months after the ALJ's decision. As the Supreme Court stated in *New York v. Ferber*, 458 U.S. 747, 767 : 20, 102 S.Ct. 3348, 3360 n. 20, 73 L.Ed.2d 1113 (1982), the "personal nature of constitutional rights" establishes "prudential limitations on constitutional ad-

judication." Therefore, the precise issue here is whether the regulation is unconstitutional as applied to these facts, not whether the regulation in some other circumstance with perhaps a greater period of time between final determination and reopening might violate the Constitution. Finally, as plaintiffs correctly point out, the Secretary's interpretation, when so challenged, is granted no special deference.

## B. *Finality*

■ The *McCuin* court's finding that notice was constitutionally deficient proceeded largely from its discussion of finality, and so I confront first the finality question. As the *McCuin* court acknowledged, there is little precedent for a due process argument based on lack of finality. The panel cited language from a Supreme Court decision which describes res judicata in such fundamental terms as to signal due process ramifications for that doctrine, at least in the judicial forum: res judicata is "essential to the maintenance of social order." *See Southern Pacific Railroad Co. v. United States,* 168 U.S. 1, 49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897). Because the Supreme Court has applied res judicata to agency determinations,[3] the *McCuin* court argued, the same constitutional interests are implicated when an agency reopens a claimant's case.

The *McCuin* court's argument that res judicata has a constitutional component is compelling, although the doctrine of finality is not as rigid as that court contends. In addition to the *Southern Pacific Railroad* case, the Supreme Court has elsewhere raised explicitly the possibility that due process may include some minimum standards of res judicata. *See Goldblatt v. Town of Hempstead,* 369 U.S. 590, 597, 82 S.Ct. 987, 991, 8 L.Ed.2d 130 (1962). The Second Circuit has strongly hinted that violation of res judicata principles might also

violate due process, *see Brotherhood of Maintenance of Way Emp. v. St. Johnsbury & Lamoille Cty R.R.,* 806 F.2d 14, 16 (2d Cir.1986) (Winter, J.), as has the Seventh Circuit. *Continental Can Co. v. Marshall,* 603 F.2d 590, 597 (7th Cir.1979).

The few courts that have actually reached the issue have found a denial of due process where state court decisions arbitrarily deprive litigants of real property interests that had been established by prior state adjudications. *See generally Corporation of Presiding Bishops v. Hodel,* 830 F.2d 374, 380 (D.C.Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988); *Sotomura v. County of Hawaii,* 460 F.Supp. 473, 481–82 (D.Haw. 1978); *Robinson v. Ariyoshi,* 441 F.Supp. 559 (D.Haw.1977), *aff'd in relevant part,* 753 F.2d 1468 (9th Cir.1985), *vacated on other grounds,* 477 U.S. 902, 106 S.Ct. 3269, 91 L.Ed.2d 560 (1986). But those decisions also recognize that "constitutionalizing" res judicata could stifle the power of legislatures, the executive branch, and the courts to change the law and correct past wrongs, and thus only an "arbitrary" refusal to apply res judicata rises to a constitutional violation. *Robinson,* 753 F.2d at 1474; *see also Hooper v. United States,* 326 F.2d 982, 985, 164 Ct.Cl. 151 *cert. denied,* 377 U.S. 977, 84 S.Ct. 1882, 12 L.Ed.2d 746 (1964) ("[T]he application of res judicata and collateral estoppel is not required by constitutional law doctrines, but each is a judicially developed restriction invoked in the name of public policy requiring that a litigant be given only one day in court...."").

Although none of these cases closely analyzes the constitutional component of res judicata, the cases as a group show that res judicata has a constitutional component, but that flexibility is necessary because policies underlying res judicata may

---

**3.** Some courts have questioned whether res judicata always applies to agency determinations. In *Coulter v. Weinberger,* 527 F.2d 224, 228 (3d Cir.1979), for example, the court refused to apply that doctrine and on its own reopened a denial of social security benefits seven years earlier under a precursor to the regulations at hand because "strict adherence to res judicata's

restrictive effects is not particularly appropriate in an administrative setting where the claimants are generally not represented by counsel and the process is not based on adversarial concepts." Congress, however, has resolved the issue for decisions made after a hearing: 42 U.S. C. § 405(g) gives res judicata effect to final decisions after a hearing.

conflict with other policies equally deserving of expression. *See generally*, C. Wright, A. Miller, E. Cooper, *Federal Practice and Procedure: Jurisdiction*, § 4403 at 21 (1981) ("... it does not seem likely that due process will come to effect any substantial changes in the general rules widely followed by federal courts as a matter of decisional law.").

*McCuin* describes the perceived constitutional right as "substantive" due process, but, in reality, plaintiffs' argument embraces both substantive due process (claimants' right to a final decision) and procedural due process (claimants' right to minimum fairness in the way their case was reopened). The substantive due process claim can be quickly addressed and just as quickly dismissed. The Secretary's decision to reopen a ruling favorable to a claimant within a limited period after it is made and to demand return of government payments, which payments themselves are not a "fundamental" right, is a decision accorded the most deferential standard of review and is not to be overturned "unless the choice is clearly wrong, a display of arbitrary power, not an exercise of judgment." *Mathews v. De Castro*, 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389 (1976) (quoting *Helvering v. Davis*, 301 U.S. 619, 640, 57 S.Ct. 904, 908, 81 L.Ed. 1307 (1937)). Not surprisingly, this standard of arbitrariness is exactly the same test as was developed by court decisions, mentioned earlier, which involved review of state court determinations denying res judicata to prior state adjudications. The Secretary's decision has a rational basis: to prevent squandering of government resources as a result of their disbursement based on erroneous decisions. There is nothing arbitrary about it. It easily withstands the minimal scrutiny demanded by a substantive due process challenge.

But when and how reopening is constitutional—the procedural due process issue—requires closer scrutiny. Certainly, analogizing to the judicial model, we take for granted the notion embodied in Fed.R.Civ. P. 60 that a final decision of a district court may be reopened for some period after it has been rendered. Specifically, clerical mistakes in judgments may be corrected at any time; furthermore, the rule provides a number of instances in which judgments may be reopened for up to one year: mistake, inadvertence, surprise, or excusable neglect; newly-discovered evidence; and fraud or misrepresentation. Rule 60(b) also allows a court to reopen a decision at any time when it is equitably necessary to do so. The court may reopen on its own for clerical errors; the other provisions generally require a motion from a party. The reopening provisions in 20 C.F.R. § 416.1489 include some of the same reasons listed in Rule 60(b): clerical error, fraud, or newly-discovered evidence. Of course, the provisions allow the Council to reopen cases for newly-discovered evidence—something a court could not do on its own motion. And, most important for the case at hand, the regulation permits reopening on a ground available to no court under Rule 60(b): "error on its face."

But the Federal Rules of Civil Procedure certainly do not set the limits of procedural due process. Rather, they provide some examples of when and why final decisions can be reopened without offending due process and, most importantly, demonstrate that due process in this instance is not so much a rigid line of demarcation beyond which no adjudicator may cross, as a fluid concept given shape by the particular circumstances of each case. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).

I find the balancing test in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), helpful for gauging the constitutionality of the reopening here. *Eldridge* involved the question of what pre-termination proceedings were necessary to afford due process to social security claimants. *Eldridge* prescribed three elements to be balanced: the private interest involved, the government's interest, and the efficacy of procedural safeguards in preventing erroneous deprivation. Although *Eldridge* concerned whether additional pre-termination procedures were constitutionally necessary, while the case at hand involves whether post-award

procedures are unconstitutional, the Court's approach in *Eldridge*—balancing the competing private and government interests and the value of the procedure in question—provides guidance for determining whether the Secretary may constitutionally reopen a case three months after a final ALJ decision.

There is the private interest in the expectation that a final decision granting benefits will remain final—or, as the *McCuin* court remarked, avoiding the prospect that "[a] favorable decision ... means only that the claimant must put the money in escrow...." *McCuin*, 817 F.2d at 172. This interest is somewhat attenuated by regulations that allow SSA to waive repayment of any overpayment when the claimant is without fault and compelling payment would be inequitable. *See Gerstein*, 680 F.Supp. at 1209. It is further lessened by the fact that denial of SSI benefits does not usually "deprive [one] ... of the very means by which to live...." *Eldridge*, 424 U.S. at 340, 96 S.Ct. at 905 (quoting *Goldberg v. Kelly*, 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970)). Attentuated or not, however, the private interest is a valid one as SSI recipients are usually in straitened financial circumstances. *Eldridge*, 424 U.S. at 342–43 & n. 27, 96 S.Ct. at 906–07 & n. 27.

To be weighed against that interest, however, is the government interest mentioned earlier—whose significance need not be belabored—in protecting the government from disbursement of its limited funds to ineligible recipients.

Finally, there is the efficacy of allowing the government a chance to correct serious errors through reopening. Thousands of hearings must be reviewed by the SSA to determine whether serious error has been committed. J. Mashaw, C. Goetz, F. Goodman, W. Schwartz, P. Verkuil & M. Carrow, *Social Security Hearings and Appeals: A Study of the Social Security Administration Hearing System* xi (1978) (With 180,000 cases in 1976 alone, SSA's hearing system is "probably the largest adjudicative agency in the western world.") The need for uniformity in decision-making

is thus a constant problem. *See, generally, Santise v. Schweiker*, 676 F.2d 925, 930–31 (3d Cir.1982), *cert. denied sub nom. Simmons v. Heckler*, 461 U.S. 911, 103 S.Ct. 1889, 77 L.Ed.2d 280 (1983). Because SSA has no attorney present at the hearing, A. Abraham & D. Kopelman, *Federal Social Security* at 119 (1979), no one can provide detailed information in aid of a prompt decision to reopen a case. Rather, the Regional Commissioner or the Council must review hundreds of pages of testimony and documentary evidence for each case because errors, such as the one at hand, are often hard to detect. Here, for example, the ALJ's decision at first glance suggests he had considered all the documentary evidence. Only when that evidence is fully examined does error become apparent. Accordingly, if due process were held to forbid reopening, or to establish a short deadline, serious errors could go unrectified because SSA was not able to act in time. *See* J. Mashaw at 106–7 (noting the value of agency appellate review in correcting ALJ errors). Moreover, because SSI benefits are ongoing, such errors could be compounded.

Flexibility in due process is especially necessary when the adjudicative process is informal and non-adversarial, because serious errors frequently can go undetected in such a setting. The *McCuin* court decried the "dual power" of the Council to act as both prosecutor and judge in reopening, *McCuin*, 817 F.2d at 172. Although in a real sense SSA is a prosecutor and judge throughout this adjudicative process because the process is so informal, this concern is a valid one. But the *McCuin* court failed to see the burden an informal hearing imposes on SSA: because the hearings are non-adversarial, and no government prosecutor is present, SSA is at a disadvantage in discovering error at all, let alone finding it in timely fashion.

By restricting reopening to discrete and narrow grounds like "error on its face," the regulations are narrowly-tailored to ensure that only serious errors are in fact rectified. Fed.R.Civ.P. 60 shows that even final judgments after full-blown adversarial hearings can be reopened for up to a

year to correct a limited class of serious errors. Certainly, then, there is no constitutional infirmity in affording the government a limited time to reopen cases for serious error. Of course, at some point, the private interest in finality overcomes the government's interest in correcting errors. But there is no need in this case to decide when or under what conditions that would occur. Given the narrow ground for reopening asserted here and the minimal time delay of slightly more than three months after the ALJ's final decision, I find this reopening does not deny procedural due process.

### C. Notice

▉ Plaintiffs raise two notice claims: first, that the notice of favorable decision accompanying the ALJ's report failed to give adequate notice of the Secretary's intentions; and, second, that the Council's July 28, 1986 letter to claimants notifying them of the reopening failed to give them notice of the full scope of issues the Council would review and thus a true opportunity to be heard as required by *Eldridge*, 424 U.S. at 332–33, 96 S.Ct. at 901–02. I find neither persuasive.

The *McCuin* court found the notice in that case, identical in all relevant ways to the one here, vague as to whether the Council on its own could reopen a case. The panel objected chiefly to the omission of the phrase "on its own motion" from the sentence that notifies the claimant of possible reopening. That phrase does appear in the sentence that notifies the claimant of possible review within sixty days of the ALJ decision. To my eye, the paragraph, when read in its entirety, states clearly that the Council has the power to reopen on its own motion:

> The enclosed decision is favorable to you, either wholly or partly....
>
> *If you disagree with the decision*, you have the right to request the Appeals Council to review it within *60* days from the date of *receipt* of the notice of this decision....
>
> *The Appeals Council may, on its motion, within 60 days from the date shown below, review the decision, which could possibly result in a change in the decision (20 C.F.R. 404.969 and 416.-1469).* After the 60–day period, the Appeals Council generally may only reopen and revise the decision on the basis of new and material evidence, or if a clerical error has been made as to the amount of benefits or where there is an error as to the decision on the face of the evidence on which it is based (20 CFR 404.988 and 416.1488; 42 CFR 405.750 and 405.1570). If the Appeals Council decides to review the enclosed decision on its own motion or to reopen and revise it, you will be notified accordingly. (Tr. at 13) (emphasis in original)

The third paragraph above as a whole details the various ways in which the Council can change an ALJ's final decision. Both the "review" sentence and the "reopen" sentence have a subject, the Council, and an active verb, "review" and "reopen," showing what the subject "may" do. Because the review sentence begins the paragraph, it makes sense for the author to explain how the Council can act: "on its own motion." It would be redundant to add this phrase to the second sentence. If the second sentence used the passive voice, as in "your case may be reopened if ...," I might understand the *McCuin* court's concern that the claimant is inadequately notified how the reopening can occur. But the sentence has a subject and an active verb; the subject is the Council and the verb is reopen, as in the "Council ... may ... reopen...." I believe due process demands only enough clarity to inform one who would understand, not enough specificity to frustrate one who would evade.

The second criticism leveled by the *McCuin* court—that the notice advised claimants of their right to ask that a decision be reviewed in sixty days, but not of their right to ask that it be reopened—is sounder, but irrelevant to the injury asserted here. Plaintiffs' injury is that the Council reopened a decision favorable to them allegedly without notifying them in advance of this possibility, not that they were left ignorant of their right to reopen an unfavorable decision if they so desired.

The lack of notice that claimants in general could reopen did not affect these plaintiffs' constitutional right to due process.

Plaintiffs' remaining defective notice claim is that the Council's July 28, 1986 letter did not adequately inform them of the grounds upon which the Council was reopening their case. Specifically, plaintiffs argue that the letter apprised them only of the legal question—whether an individually-owned account should always be considered a resource of the individual, not the factual question—whether the documentary evidence demonstrated that the ALJ had erred. If they had known that a factual question was raised, they claim, they would have requested a supplemental hearing. As I said earlier in the discussion of whether the ALJ's decision, considered with the evidentiary record, showed "error on its face," the letter clearly informed plaintiffs that, "in the absence of persuasive legal argument *or evidence to the contrary*, the Appeals Council proposes to find that you had resources in excess of the allowable limit...." (Tr. at 173) (emphasis added) Thus, plaintiffs were notified that the ALJ's decision would be reviewed for both legal and factual error, and they filed a brief with the Council urging affirmance of the ALJ's decision. Plaintiffs received full notice of what the Council proposed to do, *See Fowler*, No. 87 Civ. 0056, slip op. at 12, and thus could have requested a supplemental hearing if it were necessary.

Moreover, this was not a situation where plaintiffs were prejudiced by the Council considering, for example, new and unchallenged evidence. Indeed, plaintiffs concede that none of the documentary evidence referred to in the Council's decision was new, but was available to the ALJ and in fact included in his decision. *See* Memorandum of Law in Support of Plaintiffs' Motion for Judgment on the Pleadings at 34–35. Accordingly, apart from the result, the Council's actions did not prejudice plaintiffs in any meaningful way.

### V.

The final issue is whether the Secretary's decision to deny benefits is based on substantial evidence. Plaintiffs press two arguments to support their insistence that it is not. First, they question whether the documentary evidence in fact rebutted Mrs. Gutierrez's testimony. Second, they assert that the Council committed legal error by failing to apply appropriate New York law to determine ownership of individual accounts. Neither claim has merit.

Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed. 2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). Because I found earlier, upon *de novo* review, that the ALJ's decision was properly reopened as facially erroneous when considered with the evidentiary record, most of that discussion applies with greater force to the question here, because, in these circumstances, the "substantial evidence" test is less demanding than the "clearly erroneous" standard I applied earlier.

The documentary evidence that the money market account was opened with funds from plaintiffs' joint account, that an account was opened in plaintiffs' daughter's name the day the money market account was closed, as well as the telling pattern of withdrawals and deposits, all demonstrate that Mrs. Gutierrez's story was not credible. Although this evidence does not show that all the money belonged to Mrs. Gutierrez, no such showing was necessary. All the regulations require to justify withdrawal of benefits is that claimant have control of the account such that a substantial part of it be available for use. The evidence shows conclusively that some of the money was hers and that the rest was available to plaintiffs as an emergency resource, while the account also provided her sister with a high rate of return and the security of an American bank. As such, it was within the "right, authority or power" of plaintiffs and fits the definition in the regulations.

Plaintiffs argue that the Council erroneously failed to apply New York law. Yet New York law is of doubtful relevance

here and, if it were applied, it would not help these plaintiffs. Because plaintiffs claim the meaning of "right, authority or power" is elusive, they argue that the Secretary committed legal error in failing to apply New York law to the determination of ownership of the money market account. Although plaintiffs are correct that state law is sometimes helpful, *see, e.g., Rosenfeld v. Secretary of Health and Human Services,* 563 F.Supp. 1192, 1196 (E.D.N.Y. 1983) (Weinstein, J.), plaintiffs' basis for finding legal error in the failure to consult state law—that the meaning of "right, authority or power" is elusive—is wrong. At least as to individual accounts, the regulations are sufficiently clear because they properly focus the inquiry on whether the individual named on the account rather than someone else is directing activity in the account. As such, they provide sufficient guidance to ALJs as well as courts, rendering resort to state law principles unnecessary.

Moreover, plaintiffs have not shown that New York law would change the result here. Thus, plaintiffs recognize that, under New York law, when a bank account bears the name of a person, there arises a presumption that the account belongs to that person. *Carroll v. Smith,* 229 A.D. 286, 241 N.Y.S. 546 (3d Dep't 1930). The Council merely concluded that plaintiffs failed to rebut the presumption. Indeed, if anything, plaintiffs' interest would have been better served by an argument that New York law did *not* apply, in recognition of the presumption of ownership that New York places on the named depositor of an individual account.

The same is true of plaintiffs' attempt to analogize to constructive trust law. Plaintiffs contend that the elements of a constructive trust are present because Mrs. Gutierrez always intended to return the money and her sister never intended to give up title. But the burden is on plaintiffs to prove a constructive trust by clear and convincing evidence that the funds do not belong to the person with apparent ownership. *Schmieder v. Hall,* 421 F.Supp. 1208, 1216 (S.D.N.Y.), *aff'd,* 545 F.2d 768 (2d Cir.1976), *cert. denied,* 430

U.S. 955, 97 S.Ct. 1601, 51 L.Ed.2d 805 (1977). Plaintiffs have not shown that the Council's decision to disbelieve their evidence is without substantial support in the record, let alone that it is so lacking in support as to elevate plaintiffs' proof to the stature of clear and convincing evidence.

Finally, plaintiffs contend that the transfer of money from Mrs. Mallol to Mrs. Gutierrez could not be a gift because the parties never intended permanent possession. But the Secretary never found that the money was a "gift"; rather, the Council determined that the money was a resource under the regulations because Mrs. Gutierrez had the right, authority or power to liquidate the account. The Council had no need to determine where the money came from in order to find that plaintiffs had access to it.

At its most basic, however, plaintiffs' argument that the Council should have applied New York law is rooted in their belief that, because intent would then be part of the legal test, the Council should have given greater deference to the ALJ's credibility findings. *Cf. Sawyer v. Arum,* 690 F.2d 590 (6th Cir.1982) (where intent is a critical finding of fact, a district court's assessment of witness credibility cannot be lightly set aside). But even deferring to the ALJ's credibility determinations, his decision can be overturned if the documentary evidence renders the testimony implausible. *See Anderson v. City of Bessemer,* 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985). The Secretary had more than enough evidence to find that Mrs. Gutierrez's story was unbelievable.

\*    \*    \*

For the reasons set forth above, the Secretary's determination that the funds in the money market account were resources available to claimants is based on substantial evidence. The decision to deny benefits for the period the money market account was opened, as well as for two years thereafter because resources were transferred for less than their fair market value, was correct.

Accordingly, defendant's motion for judgment on the pleadings is granted in its entirety. Plaintiffs' motion is denied; the complaint is dismissed.

SO ORDERED.